67 P.3d 68

David SWALLOW and Anne Swallow, husband and wife, Plaintiffs–Appellants,

v.

EMERGENCY MEDICINE OF IDAHO, P.A., an Idaho professional corporation; William H. Blahd, M.D., an individual, Defendants–Respondents,

and

St. Luke's Regional Medical Center, Ltd., a general non-profit corporation; Idaho Emergency Physicians, P.A., an Idaho professional corporation; Donald E. Walker, M.D., P.A., a professional association; and John Does 1 through 10, inclusive, Defendants.

No. 27997.

Supreme Court of Idaho, Boise, January 2003 Term.

April 2, 2003.

Law Offices of Scot M. Ludwig, Boise, for appellants. Daniel A. Miller argued.

Hall, Farley, Oberrecht & Blanton, P.A., Boise, for respondents. Richard E. Hall and Kevin J. Scanlan argued.

EISMANN, Justice.

This is an appeal from a judgment dismissing the Plaintiffs' complaint on motion for summary judgment after the district court ruled that the Plaintiffs' expert testimony regarding causation was inadmissible. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

On June 4, 1997, plaintiff-appellant David Swallow went to the emergency room at St. Luke's Regional Medical Center in Boise, Idaho, where Dr. William S. Blahd treated him for a prostate gland infection. While treating Mr. Swallow, Dr. Blahd consulted with a urologist, who recommended that Mr. Swallow be prescribed the antibiotic Ciprofloxacin (Cipro) to be taken at the rate of 1500 milligrams per day (either 750 milligrams twice a day or 500 milligrams three times a day). Dr. Blahd administered an intravenous loading dose of Cipro to Mr. Swallow in the emergency room, and then gave him a prescription for Cipro. When writing the prescription, Dr. Blahd incorrectly directed that Swallow take three 500–milligram tablets three times a day rather than one 500–milligram tablet three times a day. Mr. Swallow filled the prescription at the hospital's outpatient pharmacy and went home.

At approximately 11:00 a.m. on June 5, 1997, Mr. Swallow took three 500–milligram Cipro tablets as prescribed and then went to the urologist's office for an appointment. After seeing the urologist, Mr. Swallow and his wife drove to a family member's home to visit. Later that day, at approximately 3:30 p.m., while driving back home to Idaho City, Mr. Swallow began experiencing chest tightness and nausea. After they arrived home, Mrs. Swallow telephoned for medical assistance, and approximately one hour later Mr. Swallow was flown by helicopter to St. Luke's Regional Medical Center, where he was diagnosed as having suffered a myocardial infarction (heart attack).

On June 2, 1999, the Swallows filed this action to recover damages resulting from Mr. Swallow's heart attack. This action was ultimately dismissed as to all defendants except Emergency Medicine of Idaho, P.A., and Dr. Blahd (herein jointly called "Dr. Blahd"). In order to show that the heart attack was caused by an overdose of Cipro, the Swallows retained Dr. Carl Tommaso, a cardiologist, and Dr. Catherine Heyneman, a pharmacologist, as expert witnesses. In their depositions, they both testified that in their opinions the overdose of Cipro caused Mr. Swallow's heart attack.

On May 30, 2001, Dr. Blahd moved to exclude opinion testimony from Dr. Tommaso that Cipro caused Mr. Swallow's heart attack, statements about Cipro contained in the Physician's Desk Reference (PDR), and evidence regarding adverse reaction reports from the Food and Drug Administration (FDA) regarding Cipro. The basis of the motion was that there was no scientific evidence that Cipro could cause a heart attack. The district court heard the motion, and on June 21, 2001, issued a memorandum decision and order granting the motion.

Dr. Blahd then filed a motion for summary judgment, and the Swallows filed a motion asking the district court to reconsider its ruling. In connection with his motion for summary judgment, Dr. Blahd argued that Dr. Heyneman's opinion testimony was likewise inadmissible for the same reasons that Dr. Tommaso's opinion testimony had been ruled inadmissible. The district court agreed and granted Dr. Blahd's motion for summary judgment on the ground that there was no admissible evidence showing that the Cipro could cause a heart attack. The district court also denied the Swallow's motion to reconsider its prior ruling excluding the opinion testimony of Dr. Tommaso, the references to Cipro in the PDR, and the adverse reaction reports. On October 25, 2001, the district court entered judgment dismissing this action, and on November 20, 2001, the Swallows timely filed a notice of appeal.

On November 6, 2001, Dr. Blahd filed a memorandum of costs in which he sought $6,162.64 in costs as a matter of right and $7,227.21 in discretionary costs. The Swallows timely objected to the costs claimed, and on January 29, 2002, the district court entered its order awarding costs as a matter of right in the sum of $4,662.64 and discretionary costs in the sum of $6,462.80. On January 30, 2002, the Swallows filed an amended notice of appeal, and on February 5, 2002, they filed a second amended notice of appeal in which they added the order awarding costs as an additional issue on appeal.

## II. ISSUES ON APPEAL

A. Did the district court abuse its discretion in excluding from evidence the opinion testimony of Dr. Tommaso, the information about Cipro contained in the PDR, and the Food and Drug Administration adverse incident reports?

B. Did the district court abuse its discretion in excluding from evidence the opinion testimony of Dr. Heyneman?

C. Did the district court err in granting Dr. Blahd's motion for summary judgment?

D. Did the district court abuse its discretion in awarding discretionary costs?

E. Are the Swallows entitled to an award of attorney fees on appeal?

## III. ANALYSIS

**A. Did the District Court Abuse Its Discretion in Excluding from Evidence the Opinion Testimony of Dr. Tommaso, the Information About Cipro Contained in the PDR, and the Food and Drug Administration Adverse Incident Reports?**

Rule 702 of the Idaho Rules of Evidence states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." This rule provides the appropriate test for measuring the relia-bility of evidence. *State v. Merwin*, 131 Idaho 642, 962 P.2d 1026 (1998).

The admissibility of expert testimony is a matter committed to the discretion of the trial court, and the court's ruling will not be overturned absent an abuse of that discretion. *Clark v. Klein*, 137 Idaho 154, 45 P.3d 810 (2002). When reviewing an alleged abuse of discretion by the trial court, our sequence of inquiry is: (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason. *State v. Merwin*, 131 Idaho 642, 962 P.2d 1026 (1998); *Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.*, 119 Idaho 87, 803 P.2d 993 (1991).

**1. Did the District Court Abuse Its Discretion in Excluding from Evidence the Opinion Testimony of Dr. Tommaso?** The issue in this case is whether the trial court has the discretion to determine whether or not there is a scientific basis for an expert's opinion regarding scientific knowledge. The Swallows argue that the trial court has discretion to determine whether or not a witness is qualified as an expert regarding the scientific matters about which the witness is asked to testify, but the trial court does not have discretion to determine whether or not there is a scientific basis for the expert's opinion. We disagree.

To be admissible, the expert's testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. An expert opinion that is speculative or unsubstantiated by facts in the record is inadmissible because it would not assist the trier of fact to understand the evidence or determine a fact that is at issue. *Bromley v. Garey*, 132 Idaho 807, 979 P.2d 1165 (1999). When the expert's opinion is based upon scientific knowledge, there must likewise be a scientific basis for that opinion. If the reasoning or methodology underlying that opinion is not scientifically sound, then the opinion will not assist the trier of fact to understand the evidence or determine a fact in issue.

The foundation for the admission of opinion testimony based upon scientific knowledge includes both that the witness is an expert in the field and that there is a scientific basis for the expert's opinion. *State v. Faught*, 127 Idaho 873, 908 P.2d 566 (1995) (admission of expert opinion testimony linking defendant to crime based upon DNA evidence was upheld where witness was qualified as an expert witness in the field and the statistical base used in determining the frequency of a random DNA match was scientifically reliable); *State v. Gleason*, 123 Idaho 62, 844 P.2d 691 (1992) (foundation for admission of opinion testimony regarding horizontal gaze nystagmus (HGN) test required showing that HGN test was scientifically reliable and that witness was qualified to testify regarding the test and administering it to the defendant); *State v. Rodgers*, 119 Idaho 1047, 812 P.2d 1208 (1991) (admission of testimony regarding the interpretation of blood splatter evidence upheld where evidence showed that blood splatter analysis was a well-recognized discipline based upon the laws of physics and that the witnesses were sufficiently qualified to testify as experts regarding blood splatter evidence). Because the trial court has the discretion to determine whether a proper foundation has been laid for the admission of expert testimony, *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 995 P.2d 816 (2000); IDAHO R. EVID. 104(a), the trial court has discretion to determine both whether the expert is qualified as an expert in the field and whether there is a scientific basis for the expert's opinion.

Dr. Blahd did not challenge the qualifications of Dr. Tommaso as an expert in cardiology. Rather, he challenged the scientific basis for Dr. Tommaso's opinion. In his deposition, Dr. Tommaso testified that in his opinion there was a high likelihood that the very high dose of Cipro taken by Mr. Swallow had a role in precipitating his heart attack. Dr. Tommaso admitted that for a medication to cause a heart attack, the medication would have to have either a vasoactive or pro-coagulative effect, and he did not know whether Cipro had either effect. He also stated that he did not know of any research or studies that would suggest that the dosage taken of Cipro had any effect in causing a myocardial infarction. When asked to be specific as to how the Cipro could have had a role in precipitating Mr. Swallow's heart attack, Dr. Tommaso answered, "We don't know the pathophysiology. I'm aware from the PDR and from the FDA that Cipro can precipitate a myocardial infarction. How it does it, I don't know. So my use of the word 'role' is the fact that it can precipitate a myocardial infarction."

Dr. Tommaso based his opinion that the Cipro had a role in causing Mr. Swallow's heart attack upon the PDR and upon adverse reaction reports from the FDA. He testified that both of these sources confirm that Cipro can precipitate a myocardial infarction.

The PDR does not state that Cipro can cause a myocardial infarction. The PDR information regarding Cipro contains a subsection entitled "Adverse Reactions," which states:

> During clinical investigation with the tablet, 2,799 patients received 2,868 courses of the drug. Adverse events that were considered likely to be drug related occurred in 7.3% of patients treated, possibly related in 9.2% (total of 16.5% thought to be possibly or probably related to drug therapy), and remotely related in 3.0%. Ciprofloxacin was discontinued because of an adverse event in 3.5% of patients treated, primarily involving the gastrointestinal system (1.5%), skin (0.6%), and central nervous system (0.4%).

The subsection then listed "the most frequently reported events, drug related or not." Those "drug related or not" events occurring in more than 1% of the ciprofloxacin patients were "nausea (5.2%), diarrhea (2.3%), vomiting (2.0%), abdominal pain/discomfort (1.7%), headache (1.2%), restlessness (1.1%), and rash (1.1%)." The subsection then listed 77 other events, "drug related or not," that occurred in less than 1% of ciprofloxacin patients. One of the events listed was myocardial infarction. Thus, the PDR simply states that some unknown number of people, constituting less than 1% of the 2,799 patients in the clinical investigation, had a subsequent myocardial infarction that may or

may not have been related to taking the Cipro.

Dr. Tommaso also relied upon FDA adverse reaction reports. He testified that physicians or other health care providers submit these reports to the FDA when they suspect that there is a causal relationship between a drug and an adverse event. The applicable regulation defines "adverse drug experience" as "[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related." 21 CFR § 314.80(a). Dr. Tommaso based his opinion upon copies of eleven FDA adverse reaction reports concerning Cipro. In ten of those reports, the patient suffered a cardiac arrest or myocardial infarction, and in the other the patient attempted suicide while being administered Cipro in the hospital and then committed suicide two days after discharge. The FDA adverse reaction reports contain ten instances in which the physician or health care provider suspected there might be a causal connection between the administering of Cipro and a subsequent myocardial infarction or cardiac arrest. Dr. Tommaso agreed that those reports were based solely upon the temporal relationship between the administration of Cipro and the adverse cardiac event. These ten events occurred during the period from June 1989 through June 1997. There was no showing as to what percentage of Cipro patients are represented by these ten events, nor was there any showing that these ten events were statistically significant. In other words, there is no showing that ten adverse cardiac events occurring over eight years to patients who had been administered Cipro is a greater incidence of such events than would be expected to occur by chance.

When ruling that Dr. Tommaso's testimony was not admissible, the district court reasoned as follows:

> There is no scientific evidence before me that has been tested, published, peer-reviewed or otherwise shown to be reliable which establishes that Cipro in any amount can cause heart attacks. Thus, the proffered testimony and evidence, regardless of other possible objections, really amounts to nothing more than speculation based on a temporal concurrence of events. A jury

does not need the "assistance" of this type of "expert" testimony to draw the same speculative conclusion that Cipro caused the myocardial infarction in this case.

The district court did not abuse its discretion in ruling that the foundation for Dr. Tommaso's opinion testimony was insufficient because there was no showing that an overdose of Cipro can cause a myocardial infarction.

**■ 2. Did the District Court Abuse Its Discretion in Excluding from Evidence the Physician's Desk Reference and the Food and Drug Administration adverse reaction reports?** As explained above, the PDR and the FDA adverse reaction reports merely state that some patients who have been administered Cipro have later had a myocardial infarction or cardiac arrest. The PDR reported that in less than 1% of the cases, a person administered Cipro had a myocardial infarction, and the FDA adverse reaction reports show that there were ten reported incidents of a person having a myocardial infarction or cardiac arrest after being administered Cipro. Neither source shows what percentage of the patients given Cipro had a myocardial infarction or cardiac arrest, nor is there any evidence showing that such percentage, whatever it was, is statistically significant.

When ruling that the PDR and FDA adverse reaction reports were inadmissible, the district court wrote as follows:

> However, the FDA regulations concerning reporting of adverse reactions to drugs, 21 CFR §§ 201.57(3) and 314.80, clearly indicate that the reporting requirement is purely associational; no causal relationship need be proved and reports must be submitted whether or not the noted reaction is considered drug related. Thus, while the PDR is concededly a "learned treatise" upon which physicians regularly rely, the information concerning any association between Cipro and cardiovascular events reported therein does not satisfy the requirements of Rule 702 and *Daubert* or *Merwin* that there be scientifically reliable proof that Cipro can cause such events. The FDA reports suffer from the same defect. There is no scientific evidence before me that has been tested, published, peer-re-

viewed or otherwise shown to be reliable which establishes that Cipro in any amount can cause heart attacks. Thus, the proffered testimony and evidence, regardless of other possible objections, really amounts to nothing more than speculation based on a temporal concurrence of events.

The district court did not abuse its discretion in holding that the PDR and FDA adverse reaction reports were inadmissible in this case.[1]

**B. Did the District Court Abuse Its Discretion in Excluding from Evidence the Opinion Testimony of Dr. Heyneman?**

■ The Plaintiffs also presented the deposition testimony of Dr. Catherine Heyneman, a pharmacologist. She testified that in her opinion the Cipro taken by Mr. Swallow was causally related to his subsequent heart attack because of the temporal relationship between taking the Cipro and the heart attack, because the peak level of Cipro in Mr. Swallow's blood would have occurred fairly close to the time when he had the heart attack, and because of Mr. Swallow's lack of other risk factors. She stated that to her knowledge, a drug could cause a heart attack if the drug produced one of four effects: (a) arrhythmia, (b) thickening of the blood so that it is more easily coagulable, (c) constriction of the blood vessels, or (d) tachycardia. She admitted that to her knowledge, Cipro did not have any procoagulative or vasoconstrictive effect, nor was she aware of any pro-arrhythogenic effect that could possibly be related to Cipro. Dr. Heyneman testified that there is some literature that suggests that in some patients Cipro can cause tachycardia, but on further questioning she admitted that the literature merely stated that in some patients it can cause hypertension. Although tachycardia can cause hypertension, Dr. Heyneman admitted they are not synonymous and the literature did not state that Cipro can cause tachycardia. Finally, Dr.

Heyneman testified that there were animal studies that link Cipro to ventricular tachycardia. In those studies, a dosage of Cipro equivalent to ten times the dose taken by Mr. Swallow caused ventricular tachycardia in rats. There was no showing, however, that the results of these rat studies are applicable to humans or to any other species.

In ruling that there was not adequate foundation for Dr. Heyneman's opinion that the Cipro taken by Mr. Swallow was a cause of his heart attack, the district court reasoned as follows:

> The information provided concerning the bases for the opinions of Dr. Heynemann [sic] has been reviewed. It suffers from the same defects as the basis for Dr. Tommaso's opinions. The opinions are based on the facts that the heart attack occurred within two hours [of] the peak level of Cipro in Mr. Swallow's blood and that Mr. Swallow had no real risk factors for heart attack, coupled with a purported association between Cipro and heart attacks, although there is no evidence that Cipro can or does cause myocardial infarctions. For the same reasons set forth in the ruling concerning the cardiologist Dr. Tommaso, the opinions of Dr. Heynemann [sic] are not admissible.

The district court did not abuse its discretion in ruling that the foundation for Dr. Heyneman's opinion testimony was insufficient because there was no showing that an overdose of Cipro can cause a myocardial infarction.

**C. Did the District Court Err in Granting Dr. Blahd's Motion for Summary Judgment?**

■ The district court granted Dr. Blahd's motion for summary judgment on the ground that there was no admissible expert testimony showing that Cipro could cause a myocardial infarction. As the district court wrote:

> The court found such evidence inadmissible both under the *Daubert* test and under Rule 702 of the Idaho Rules of Evidence, considering the factors identified in *Merwin*. Although this Court has not adopted the *Daubert* test for admissibility, the district court's decision is also based upon the analysis in *Merwin*.

---

1. The district court analyzed the admissibility of the expert testimony of Drs. Tommaso and Heyneman and of the PDR and the FDA adverse reaction reports under both *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *State v. Merwin*, 131 Idaho 642, 962 P.2d 1026 (1998).

[I]n this case some admissible expert testimony is necessary to tie Plaintiff David Swallow's heart attack to the ingestion of an overdose of Cipro. In other words, in this case without some reliable expert testimony relating Cipro to myocardial infarction, there is no chain of circumstances from which causation reasonably could be inferred.

Relying upon *Sheridan v. St. Luke's Regional Medical Center*, 135 Idaho 775, 25 P.3d 88 (2001), the Plaintiffs argue that expert testimony as to causation is not a requirement in a medical malpractice case. Thus, Plaintiffs argue that even if the opinions of Drs. Tommaso and Heyneman were inadmissible, there was still sufficient evidence of causation to defeat Dr. Blahd's motion for summary judgment.

In *Sheridan*, this Court affirmed the denial of a motion for directed verdict made by the defendant hospital in a medical malpractice case. The hospital moved for a directed verdict on the ground that the plaintiffs had failed to prove that the hospital's alleged negligence caused harm to the plaintiffs' child. The child was born at the hospital on March 23, 1995, and was discharged about 36 hours later. He had jaundice at the time of his discharge. The child's pediatrician next saw him on March 28, 1995, three days after discharge, because the child's mother called and said that the child had ceased to feed as vigorously, seemed sleepy and lethargic, and was still yellow. The following day the child's mother telephoned the pediatrician to report that the child was not improving and that his jaundice had increased. Upon the pediatrician's order, the child was readmitted to the hospital on March 29, 1995. Tests done upon readmission indicated that the child had a high bilirubin level. After treatment for his jaundice, the child was discharged from the hospital on April 2, 1995. His pediatrician ultimately diagnosed him as having cerebral palsey. Later, a physician diagnosed the child as having kernicterus, a form of cerebral palsy associated with a neonatal history of elevated serum bilirubin and consequent jaundice.

There was evidence of negligence by the hospital's nursing staff. The two nurses who attended the child during his first 24 hours of life both noticed he was jaundiced, but they did not notify the child's pediatrician of that fact. There was expert testimony that jaundice appearing in the first 24 hours is pathologic and requires further evaluation such as serum bilirubin measurement. The nurses knew that no bilirubin tests had been conducted on the child, although such tests were routine and readily available. Both nurses testified that they would be concerned if the jaundice progressed rapidly, but neither of them charted any indicia from which the progress of the jaundice could be ascertained. The nurses also failed to note the possible blood incompatibility between the child and his mother. The pediatrician testified that had he known of the blood incompatibility, he would have treated the child's hyperbilirubinaemia more aggressively. Evidence was presented that high bilirubin levels can be successfully treated by the use of bili lights and blood exchange transfusions. When mother and child were discharged, the nursing staff advised the mother about normal jaundice, but did not warn her that this jaundice may not be normal and that serious brain damage could occur·if it worsened and was not treated.

The hospital moved for a directed verdict because the plaintiffs did not present direct expert testimony that the nurses' alleged negligence caused the child's kernicterus. The district court denied the motion, and we upheld the denial on the ground that from the evidence presented, the jury could reasonably and naturally infer from a chain of circumstances that the nurses' negligence was a proximate cause of the child's injuries. When doing so, we did not hold that expert testimony is never necessary in order to prove causation in a medical malpractice case. We simply held that expert testimony that the nurses' negligence was a proximate cause of the child's injuries was not required under the facts of that particular case.

When defending Dr. Blahd's motion for summary judgment, the Swallows were entitled to all reasonable inferences that can be drawn from the record. *Lapham v. Stewart*, 137 Idaho 582, 51 P.3d 396 (2002). The Plaintiffs argue that causation can be estab-

lished by reasonable inferences drawn from the following facts: Mr. Swallow was given a dose of Cipro that was three times the dosage intended;[2] his heart attack occurred at the approximate time of the peak level of Cipro in his blood; his cardiologist ruled out atherosclerosis, which is the most common cause of heart attacks;[3] his cardiologist believed the dose of Cipro was unusually high and temporally related to the heart attack;[4] and that he had a lack of personal and family history of cardiovascular problems.[5]

The instant case is similar to *Bloching v. Albertson's, Inc.,* 129 Idaho 844, 934 P.2d 17 (1997), in which we upheld the grant of summary judgment because of the lack of competent evidence showing causation. In *Bloching,* the plaintiff had been taking beef insulin for his diabetes. He suffered one seizure every four to six weeks because of hypoglycemic reactions to insulin. His insulin prescription was then filled with a combination of beef and pork insulin because the pharmacy was out of beef insulin. The pharmacist stated that the blend of beef and pork insulin was a direct substitute for beef insulin. Immediately after the plaintiff began using the insulin blend, he suffered a seizure. As he continued using the insulin, he suffered seizures on a daily basis, and they were considerably more violent than those he had previously experienced. After a week he discontinued using the insulin blend, but he continued to suffer violent seizures.

The plaintiff sued the pharmacy for negligence. His treating physician testified in his deposition that although it was possible that the switch to the insulin blend caused permanent injury, in his opinion it had nothing to do with the seizures. The district court ultimately dismissed the lawsuit on the pharmacy's motion for summary judgment because there were not sufficient admissible facts to demonstrate a genuine dispute regarding the proximate cause of the plaintiff's alleged injuries. On appeal, we affirmed the dismissal because "the record contains no credible, admissible testimony in opposition to Albertson's motion for summary judgment." 129 Idaho at 847, 934 P.2d at 20. The temporal relationship between the taking of the insulin blend and the onset of more frequent and severe seizures was not sufficient to prove causation.

We have previously held that a lay person was not qualified to give an opinion about the cause of a medical condition or disease. *Bloching v. Albertson's, Inc.,* 129 Idaho 844, 934 P.2d 17 (1997) (lay person was not qualified to testify that the seizure he suffered immediately after using a blend of pork and beef insulin was caused by the insulin); *Evans v. Twin Falls County,* 118 Idaho 210, 796 P.2d 87 (1990) (husband was not qualified to testify that conduct by sheriff's deputies on

2. The urologist testified that he gave Dr. Blahd the option of prescribing either 750 milligrams of Cipro taken twice a day or 500 milligrams taken three times a day. He stated that he considered them to be equal doses. Thus, the initial 1500 milligrams taken by Mr. Swallow would have been twice the maximum dosage that the urologist recommended be taken at one time.

3. Mr. Swallow's cardiologist testified in his deposition that occasionally he sees heart attack patients who do not have a lot of atherosclerosis, based upon their angiograms. He stated that cardiologists hypothesize that in those cases the artery spasmed, squeezing down the vessel and restricting the blood flow. When the flow is restricted, some of the blood becomes static and tends to clot. He also stated that Mr. Swallow had pretty mild atherosclerosis. In his opinion, a spasm was the most likely etiology, but he added that there could have been some atherosclerosis involvement. With respect to the cause of spasming, the cardiologist said, "That I think is open to a lot of different things that might go

into that. And I think our understanding of spasming is rudimentary as a profession."

4. Mr. Swallow's cardiologist testified that the dose seemed high, but he only uses Cipro on rare occasions. He also stated that he has no opinion as to whether Cipro caused Mr. Swallow's heart attack, that the temporal relationship between the Cipro and the heart attack does not establish causation, but that the unusually high dosage of Cipro triggered concern.

5. Mr. Swallow's cardiologist testified that the history taken when Mr. Swallow was in the emergency room indicated that Mr. Swallow had prior chest discomfort or chest tightness when he was under stress and swelling of his lower extremities, both of which indicated he had a possible history of cardiac problems. The cardiologist also testified that Mr. Swallow's use of "fat burner" pills containing ephedrine, which is associated with heart attacks, clouds the issue of the cause of his heart attack.

April 15, 1987, in grabbing and shaking his wife was a cause of her cardiac arrest and death over eleven months later); *Flowerdew v. Warner,* 90 Idaho 164, 409 P.2d 110 (1965) (patient was not qualified to testify that his injury was caused by physician's treatment). In support of the holding in *Evans v. Twin Falls County,* we quoted from 31A Am. Jur.2d, Expert & Opinion Evidence § 207 as follows:

Where the subject matter regarding the cause of disease, injury, or death of a person is wholly scientific or so far removed from the usual and ordinary experience of the average person that expert knowledge is essential to the formation of an intelligent opinion, only an expert can competently give opinion evidence as to the cause of death, disease or physical condition.

118 Idaho at 214, 796 P.2d at 91.

The same considerations that disqualified the lay testimony in the above cases apply here. Whether or not the Cipro taken by Mr. Swallow was a cause of his heart attack is a matter of science that is far removed from the usual and ordinary experience of the average person. A jury, comprised of lay people, is simply not qualified to determine that issue without the assistance of expert testimony establishing that Cipro can cause a myocardial infarction. Absent such testimony, any finding in that regard would be based upon speculation. In granting the motion for summary judgment, the district court wrote, "[I]n this case without some reliable expert testimony relating Cipro to myocardial infarction, there is no chain of circumstances from which causation reasonably could be inferred." The district court did not err in granting Dr. Blahd's motion for summary judgment.

**D. Did the District Court Abuse Its Discretion in Awarding Discretionary Costs?**

■ The district court awarded Dr. Blahd discretionary costs totaling $6,462.80. The Plaintiffs challenge on appeal the award of discretionary costs totaling $4,980 for the fees of three experts who did not testify either at a deposition or at trial. The three experts were a cardiologist, a pharmacologist, and an infectious disease specialist who were prepared to testify on behalf of Dr. Blahd had this case gone to trial. Rule 54(d)(1)(D) of the Idaho Rules of Civil Procedure provides that discretionary costs may be allowed "upon a showing that said costs were necessary and exceptional costs reasonably incurred, and should in the interest of justice be assessed against the adverse party." The district court found that the fees for these experts were necessary and exceptional because medical experts are essential in a medical malpractice case and they cannot be retained for the $500 awardable under Rule 54(d)(1)(C) as costs as a matter of right. The district court also found that the fees for these three experts were reasonably incurred. The district court did not make any finding, however, that these costs should in the interest of justice be assessed against the Plaintiffs, nor did Dr. Blahd present any evidence or make any argument supporting that requirement. Therefore, we reverse the award of costs totaling $4,980 for the fees of these three experts.

**E. Are the Swallows Entitled to an Award of Attorney Fees on Appeal?**

■ The Plaintiffs requested an award of attorney fees on appeal under Idaho Code § 12–121. Because they are not prevailing parties on this appeal, they are not entitled to an award of attorney fees under that statute. *King v. King,* 137 Idaho 438, 50 P.3d 453 (2002).

**IV. CONCLUSION**

We affirm the decision of the district court holding inadmissible the testimony of Drs. Tommaso and Heyneman, the PDR, and the FDA adverse incident reports. We also affirm the grant of summary judgment in favor of Dr. Blahd and the judgment dismissing this action with prejudice. We reverse that portion of the order granting discretionary costs which awards costs totaling $4,980 for the fees of the three experts. We do not award attorney fees on appeal. We award costs on appeal to the respondents.

Chief Justice TROUT, Justices SCHROEDER, WALTERS and KIDWELL concur.