128 P.3d 897

Kyle ATHAY, Plaintiff–Appellant,

v.

Dale M. STACEY, individually and in his official capacity as Sheriff of Rich County, Utah; Rich County, Utah, a political subdivision of the State of Utah; Chad Ludwig, individually and in his official capacity as a Deputy Sheriff of the Bear Lake County Sheriff's Department; Gregg Athay, individually and in his official capacity as Captain of the Sheriff's Department of Bear Lake County, Idaho; Brent Bunn, individually and in his official capacity as Sheriff of Bear Lake County, Idaho; Bear Lake County, Idaho, a political subdivision of the State of Idaho, Defendants–Respondents.

No. 31164.

Supreme Court of Idaho,
Idaho Falls, September 2005 Term.

Nov. 22, 2005.

Rehearing Denied Feb. 3, 2006.

Craig R. Jorgensen, Pocatello, argued for appellants.

Naylor & Hales, P.C., Boise, for respondents Chad Ludwig, Gregg Athay, Brent Bunn, and Bear Lake County. Kirtlan G. Naylor argued.

Stirba & Hathaway, Utah, and Pike & Smith, P.A., Idaho Falls, for respondents Dale Stacey and Rich County. Peter Stirba argued.

EISMANN, Justice.

This is an appeal from summary judgments dismissing the Plaintiffs' claims arising from a collision involving a driver fleeing a police pursuit. The district court held that none of the individual defendants' conduct reached the level of reckless disregard or was a proximate cause of the collision. We affirm in part and vacate in part.

## I. FACTS AND PROCEDURAL HISTORY

On June 10, 1999, at approximately 10:12 p.m., the sheriff's dispatcher for Rich County, Utah, broadcast a call that a possible drunken driver in a green Mustang bearing Idaho license plate 3C 1086 was heading north from the town of Randolph in northern Utah. Dale Stacey, the Rich County Sheriff (Sheriff Stacey), heard the radio call and headed to intercept the Mustang. Upon locating the car, Sheriff Stacey followed it for about one-and-one-half miles and observed it cross the centerline twice and the fog line four times. He decided to stop the car at the Sage Creek Junction, near the Utah–Wyoming border, to investigate whether the driver was under the influence of alcohol.

As the Mustang approached the stop sign at the junction, Sheriff Stacey activated the overhead lights on his Chevrolet pickup. The Mustang ran through the stop sign and headed east toward Lincoln County, Wyoming. Sheriff Stacey activated the siren on his pickup and began pursuit. The Mustang accelerated to about 70 mph, and then to over 96 mph. The Sheriff's pickup had a governor that prevented it from traveling faster than 96 mph, and so he was unable to catch the Mustang. The Mustang driver's conduct gave Sheriff Stacey probable cause to believe that the driver was committing the felony offense of eluding.

After entering Wyoming, the Mustang headed north. At Cokeville, Wyoming, it slowed to about 40 mph, and Sheriff Stacey was able to catch up to it. Upon leaving Cokeville, however, the Mustang's driver again sped up, leaving the Sheriff behind.

The highway then curved northwesterly, toward Bear Lake County located in southeast Idaho. Sheriff Stacey radioed for assistance to the Bear Lake County Sheriff's office. In response, Chad Ludwig, a deputy sheriff, (Deputy Ludwig) drove to a point southeast of Montpelier, Idaho, where he attempted to stop the Mustang using spike strips. He only succeeded in deflating its right front tire.

After crossing the spike strip, the Mustang did slow down to about 50 mph, allowing Sheriff Stacey to catch up. Once he did, however, the Mustang immediately accelerated to around 96 mph. It passed deputy sheriff Gregg Athay (Deputy Athay),[1] who had stopped on the highway two miles from where the spike strips had been deployed. Deputy Athay joined in the pursuit after the Mustang and Sheriff Stacey passed his position, and Deputy Ludwig also joined in the pursuit behind Deputy Athay.

The Mustang sped through Montpelier, Idaho, at a speed of 94 mph with the three police vehicles in pursuit. According to witnesses, the Mustang's lights were turned off as it was racing through Montpelier. While passing the Ranch Hand Truck Stop, located about two miles north of Montpelier, the Mustang swerved to avoid colliding with an

---

1. Deputy Athay is Kyle Athay's half brother.

oncoming semi-truck that was turning left into the truck stop. The driver of the semi-truck later stated that he did not even see the Mustang.

About one mile past the truck stop, the Mustang collided with a car driven by the plaintiff-appellant Kyle Athay (Athay). He had stopped to assist two teenage girls whose car had hit a deer. He was just driving away from the scene of that accident when the Mustang slammed into the rear of his car at a speed of approximately 104 mph. Athay was severely injured in the collision. The pursuit had lasted about forty-five minutes through three states. After the collision, the driver of the Mustang was identified as Darrell Ervin (Ervin).

On April 19, 2002, Kyle and Melissa Athay (Athays) filed this lawsuit against Sheriff Stacey, Rich County, Deputy Ludwig, Deputy Athay, Brent Bunn (the Sheriff of Bear Lake County), and Bear Lake County. The district court dismissed the complaint after granting the Defendants' motions for summary judgment, and Athays timely appealed.

## II. ISSUES ON APPEAL

A. Does Idaho Code § 49–623 establish a reckless disregard standard of care for police pursuits?

B. Does Idaho Code § 49–623 apply to the Rich County Sheriff?

C. Did the district court err in striking the affidavit of the Athays' expert?

D. Did the district court err in granting summary judgment to the Defendants?

E. Does the limit of liability established by Idaho Code § 6–926 apply to Sheriff Stacey and Rich County?

F. Did the district court err in failing to grant sanctions against the Bear Lake Defendants?

G. Are the Athays entitled to an award of attorney fees on appeal?

## III. ANALYSIS

**A. Does Idaho Code § 49–623 Establish a Reckless Disregard Standard of Care for Police Pursuits?**

Idaho Code § 49–623 provides as follows:

(1) The driver of an authorized emergency or police vehicle, when responding to an emergency call, or when in the pursuit of an actual or suspected violator of the law, or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions stated.

(2) The driver of an authorized emergency or police vehicle may:

(a) Park or stand, irrespective of the parking or standing provisions of this title;

(b) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;

(c) Exceed the maximum speed limits so long as he does not endanger life or property;

(d) Disregard regulations governing direction of movement or turning in specified directions.

(3) The exemptions granted to an authorized emergency or police vehicle shall apply when necessary to warn and to make use of an audible signal having a decibel rating of at least one hundred (100) at a distance of ten (10) feet and/or is displaying a flashing light visible in a 360 degree arc at a distance of one thousand (1,000) feet under normal atmospheric conditions.

(4) The foregoing provisions shall not relieve the driver of an authorized emergency or police vehicle from the duty to drive with due regard for the safety of all persons, nor shall these provisions protect the driver from the consequences of his reckless disregard for the safety of others.

The focus of the dispute centers upon the words "due regard" and "reckless disregard" in subparagraph (4) of the statute. The Athays argue that it establishes two standards of care: due regard, which they equate with negligence, and reckless disregard. They contend that for policy reasons we should apply the negligence standard and simply disregard the last phrase of the statute referring to reckless disregard.

The interpretation of a statute is a question of law over which we exercise free review. *Idaho Dept. of Labor v. Sunset Marts, Inc.,* 140 Idaho 207, 91 P.3d 1111 (2004). When construing a statute, the words used must be given their plain, usual, and ordinary meaning, and the statute must be construed as a whole. *Waters Garbage v. Shoshone County,* 138 Idaho 648, 67 P.3d 1260 (2003). We must give effect to every word, clause and sentence of a statute, and the construction of a statute should be adopted which does not deprive provisions of the statute of their meaning. *George W. Watkins Family v. Messenger,* 118 Idaho 537, 540, 797 P.2d 1385, 1388 (1990).

We are not at liberty to simply disregard a portion of the statute. The last phrase of Idaho Code § 49–623(4) states, "nor shall these provisions protect the driver from the consequences of his reckless disregard for the safety of others." It would be meaningless unless it establishes a reckless disregard standard. It would make no sense to interpret the statute as providing that the driver of an authorized emergency or police vehicle is liable for his or her negligence and will not be protected from his or her reckless disregard for the safety of others. If the driver is liable for negligence, then whether the driver's conduct also reached the level of reckless disregard would not matter.

The confusion arises as a result of equating the words "due regard" with negligence. The words "due regard" mean "consideration in a degree appropriate to demands of the particular case." Black's Law Dictionary (Rev. 4th ed. 1968) p. 590. They are not words of art synonymous with negligence. In enacting Idaho Code § 49–623, the legislature obviously balanced the need for emergency or police vehicles to respond quickly in emergencies or to pursue fleeing law violators with the risks created by such conduct. It decided that in such circumstances, due regard for the safety of others is a reckless disregard standard.

The district court held that Idaho Code § 49–623 created a reckless disregard standard for police pursuits when the vehicle being pursued collides with the vehicle of a third party and a negligence standard when the police or emergency vehicle collides with the vehicle of a third party. Such analysis is incorrect. The reckless disregard standard applies in both situations. There is nothing in the wording of subsection (4) that would indicate that the reckless disregard standard applies only when the vehicle being pursued causes a collision. The statute does not even refer to the conduct of the driver of that vehicle. It deals solely with the conduct of the person driving the emergency or police vehicle.

The district court also adopted the definition in Idaho Code § 6–904C for the reckless disregard standard contained in § 49–623. Again, the district court erred. Idaho Code § 6–904C defines the phrase "reckless, willful and wanton conduct" as it is used in the Idaho Tort Claims Act. The statute expressly provides that the definition applies only to Chapter 9 of Title 6, Idaho Code. By its terms, it does not apply to Chapter 6 of Title 49, Idaho Code.

This Court has previously defined the term "reckless disregard." In *Hodge v. Borden,* 91 Idaho 125, 134, 417 P.2d 75, 84 (1966), we adopted the definition announced by the Oregon Supreme Court in *Williamson v. McKenna,* 223 Or. 366, 354 P.2d 56, 67 (1960), which is, " 'Reckless disregard of the rights of others' could be regarded as the type of conduct engaged in by the driver when he actually perceives the danger and continues his course of conduct." We distinguished reckless disregard from gross negligence in that the latter would apply where the driver does not know of the high degree of manifest danger, but should have known.

**B. Does Idaho Code § 49–623 Apply to the Rich County Sheriff?**

When originally enacted in 1977, Idaho Code § 49–623's predecessor (§ 49–606) applied to the "driver of an authorized emergency vehicle." Ch. 152, § 3, 1977 Idaho Sess. Laws 337, 357. Idaho Code § 49–578(2), also adopted in 1977, defined an "authorized emergency vehicle" as "vehicles operated by any fire department or law enforcement agency of the state of Idaho or any political subdivision thereof, and ambu-

lances of any public utility or public service corporation." Ch. 152, § 2, 1977 Idaho Sess. Laws 337, 349. Thus, as enacted in 1977, an authorized emergency vehicle included a vehicle operated by a law enforcement agency of this state or one of its political subdivisions.

■ In 1988, former § 49–606 was amended and recodified as Idaho Code § 49–623. The amendment added the words "or police" to the statute so that it would refer to "the driver of an authorized emergency *or police* vehicle." Ch. 265, § 155, 1988 Idaho Sess. Laws 549, 659–60 (emphasis added). We must presume that the amendment intended a change in the meaning of the statute. *DeRousse v. Higginson*, 95 Idaho 173, 176, 505 P.2d 321, 324 (1973). The 1988 recodification did not change the definition of an "authorized emergency vehicle." Ch. 265, § 2, 1988 Idaho Sess. Laws 549, 569. Thus, a vehicle operated by an Idaho law enforcement agency was still within the definition of an authorized emergency vehicle. Adding the words "or police" would change the meaning of the statute only if they referred to a vehicle operated by an out-of-state law enforcement agency. Adding such vehicles to the statute would be consistent with the provisions of Idaho Code § 19–701, which grants out-of-state law enforcement officers authority to arrest when they enter this state in fresh pursuit of a fleeing felon. Therefore, the provisions of Idaho Code § 49–623 also apply to Sheriff Stacey.

The Athays contend that under Utah statutes, Sheriff Stacey could be liable for negligent conduct in a police chase and that such negligence standard should also apply to him in Idaho. The conduct causing the injury and the injury itself occurred in Idaho, not Utah. The standard of care for police chases in Utah is irrelevant. We are not at liberty to disregard the provisions of Idaho Code § 49–623 and apply Utah statutes to Sheriff Stacey when an Idaho statute provides the standard of care by which his conduct is to be judged.[2]

2. The district court conducted a choice-of-law analysis using the most-significant-relation test set forth in *Grover v. Isom*, 137 Idaho 770, 53 P.3d 821 (2002), and determined that Idaho law

### C. Did the District Court Err in Striking the Affidavit of the Athays' Expert?

■ In response to the Defendants' motions for summary judgment, the Athays filed the affidavit of their expert witness Geoffrey Alpert. The Bear Lake County Defendants then moved to strike the affidavit on the grounds that the information contained in it was conclusory and not based upon admissible evidence. The Athays filed a supplemental affidavit of Alpert, which the Rich County Defendants moved to strike on the same grounds. After hearing argument on the motions, the district court struck the affidavits. The district court determined that the affidavits were "replete with references to what the suspect would have done and what the suspect was thinking" and that there was a lack of foundation for such references. The court declined to attempt to salvage the admissible portions of the affidavits, concluding that doing so would be extremely difficult and would not affect the court's determination of the summary judgment.

■ The admissibility of expert testimony is a matter committed to the discretion of the trial court, and the court's ruling will not be overturned absent an abuse of that discretion. *Swallow v. Emergency Med. of Idaho, P.A.*, 138 Idaho 589, 67 P.3d 68 (2003). When reviewing an alleged abuse of discretion by the trial court, our sequence of inquiry is: (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason. *Id.*

■ To be admissible, the expert's testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. *Id.* An expert opinion that is speculative or unsubstantiated by facts in the

should apply. The Athays have not alleged on appeal that the district court erred in its analysis under that test.

record is inadmissible because it would not assist the trier of fact to understand the evidence or determine a fact that is at issue. *Id.* An expert's opinion is also inadmissible if it concerns conclusions or opinions that the average juror would be qualified to draw from the facts utilizing the juror's common sense and normal experience. *Rockefeller v. Grabow*, 136 Idaho 637, 647, 39 P.3d 577, 587 (2001).

That portion of the Athays' expert's testimony at issue concerns his statements regarding causation and his opinion that the defendants' conduct constituted reckless disregard. The district court did not abuse its discretion in striking the affidavits. They contained statements concerning what Ervin allegedly knew and would have done under certain circumstances and conclusions unsupported by the evidence. The expert's opinions that the conduct of the pursuing officers constituted reckless disregard was inadmissible for two reasons. First, there is no indication that the expert knew the standard in Idaho for reckless disregard. Without defining what he understood the standard to be, he simply stated several times throughout his affidavits that the officers' conduct constituted reckless disregard for the safety of others. Second, reckless disregard includes the element that the driver actually perceived the high degree of manifest danger and continued his course of conduct. *Hodge v. Borden*, 91 Idaho 125, 134, 417 P.2d 75, 84 (1966). It is not sufficient that he should have known of the danger. *Id.* The Athays' expert is no more qualified than the average juror to draw conclusions from the evidence regarding what any of the Defendants actually perceived or understood.

**D. Did the District Court Err in Granting Summary Judgment to the Defendants?**

 The district court held that as a matter of law the defendants' conduct did not rise to the level of reckless disregard or was not a proximate cause of the collision and therefore granted their motions for summary judgment. In an appeal from an order of summary judgment, this Court's standard of review is the same as the standard used by the trial court in ruling on a motion for summary judgment. *Conway v. Sonntag*, 141 Idaho 144, 106 P.3d 470 (2005). All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Id.* Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.* If the evidence reveals no disputed issues of material fact, then only a question of law remains, over which this Court exercises free review. *Id.*

 **1. Sheriff Stacey and Rich County.** The district court dismissed the case as to Sheriff Stacey, holding that the video taken from Deputy Ludwig's Jeep showed that the Mustang was well ahead of Sheriff Stacey's pickup by the time the pursuit reached the truck stop north of Montpelier and that Ervin testified that he did not even know the police were chasing him. The district court erred in adopting both of these rationales.

In its decision granting summary judgment to Sheriff Stacey and Rich County, the district court stated, "The video indicates Sheriff Stacey slowed down at the request of Deputy Athay. It also shows the [sic] Ervin's vehicle upon approaching the Ranch Hand Truck Stop was well ahead of the law enforcement vehicles. At that point, Sheriff Stacey was a considerable distance behind Daryl Ervin." We have reviewed the video, and it does not show what the district court contends.

Once the Bear Lake County deputies joined the chase, they were following behind Sheriff Stacey's pickup, with Deputy Ludwig in the rear. The video, taken from Deputy Ludwig's Jeep, primarily shows only the rear of Deputy Athay's vehicle. During a sweeping left hand turn between Montpelier and the Ranch Hand Truck Stop, there is a point where the video briefly shows Sheriff Stacey's pickup and what appears to be taillights ahead of it. They may be the taillights of the Mustang. However, there was eyewitness evidence presented that the Mustang's lights

were off as it sped through Montpelier and also when it passed the truck stop. If those were not the Mustang's taillights, then the video does not show how far it was ahead of Sheriff Stacey at that point. After that curve, the road straightened out and was essentially straight from the truck stop to the scene of the collision. There is no way to know from the video how far Sheriff Stacey was behind the Mustang during the last couple miles of the pursuit.

■ When granting summary judgment to the Rich County defendants, the district court also stated, "Mr. Ervin testified that he did not even know the police were behind him or that he was being chased—he could not remember anything." The record does not contain any testimony of Ervin. It does contain a copy of Deputy Ludwig's police report, in which he reported a conversation with Ervin, which was as follows:

I told Daryl [sic] [Ervin] that I would be charging him with Felony Eluding. Daryl asked me who he had eluded. I told Daryl [sic] that he had been being pursued for over 50 miles. Daryl [sic] told me that he had never seen a police car ever that night before the crash. I told Daryl [sic] that he had driven by me and Capt. Athay within two miles of each other, both with our emergency lights on and then 3 of us had followed him too [sic] Montpelier with lights and sirens on, and then all the way through Montpelier with lights + sirens on. And that he had been doing over 90 mph for most all of [unreadable]. Daryl [sic] told me that he had never seen any police cars, and that his cruise control had been set on 67 mph and that he hadn't gone any faster than that.

Sheriff Stacey testified that when he activated the overhead lights on his pickup in an attempt to stop the Mustang as it approached the highway junction in Utah, it immediately ran the stop sign and sped up to about 70 mph, and then to over 96 mph. Deputies Ludwig and Athay both stated that Ervin had passed them at night while they were parked on a two-lane road with their vehicles' overhead lights flashing. The pursuing officers and a Montpelier police officer had clocked Ervin several times at speeds of

at least 96 mph. Ervin's assertion that he had not seen any police cars and had been driving at only 67 mph are in conflict with other evidence, putting his credibility at issue. Summary judgment is not proper where the depositions and affidavits raise any question as to the credibility of witnesses. *Straley v. Idaho Nuclear Corp.*, 94 Idaho 917, 500 P.2d 218 (1972). Therefore, the district court erred in granting summary judgment based upon the assumption that Ervin's statement to Deputy Ludwig was truthful.

Construing the facts in the record liberally in favor of the Athays and giving them all reasonable inferences that can be drawn from the record, there is a jury issue as to whether Sheriff Stacey's conduct rose to the level of reckless disregard and whether it was a proximate cause of the collision.

Sheriff Stacey initially sought to stop Ervin for suspicion of driving while under the influence of alcohol, a misdemeanor. Ervin's conduct in fleeing constituted a felony. Sheriff Stacey did not testify that he believed Ervin was dangerous except with respect to Ervin's driving conduct while trying to elude the Sheriff.

Sheriff Stacey pursued Ervin for about forty-five minutes through three states over a distance of about sixty-three miles. Ervin sped up to 96 or more mph three times: (1) when Sheriff Stacey activated his pickup's overhead lights in an attempt to stop Ervin at the Sage Creek Junction in Utah; (2) when Sheriff Stacey caught up after Ervin had slowed to about 40 mph while driving through Cokeville, Wyoming; and (3) when Sheriff Stacey caught up after Ervin had slowed down to about 50 miles per hour upon running over the spike strips. After the first mile of the pursuit, Sheriff Stacey knew that he could not overtake the Mustang because its top speed exceeded his pickup's top speed of 96 mph. A reasonable inference is that Sheriff Stacey knew he had no reasonable chance of stopping the Mustang as long as the Mustang's driver was willing to drive in excess of 96 mph.

Sheriff Stacey testified that he considered the hazards of this chase as being high. He acknowledged that the pursuit would stop

only if the Mustang crashed into something or someone, or if the Mustang's driver decided to stop, or if the Mustang ceased operating due to a mechanical failure or running out of gas. Considering the length of the pursuit, there appeared to be little likelihood that the driver would voluntarily stop. The only possible mechanical failure mentioned was the loss of a tire due to the spike strips. Although the Mustang initially slowed to 50 mph after running over the spike strips, it had sped back up to 96 mph when it passed Deputy Athay's stopped vehicle two miles later, and it continued at that high rate of speed. There was no testimony offered that the Mustang could not be expected to travel very far running on the right front rim. The collision occurred about eleven miles after the Mustang ran over the spike strips.

Eyewitness testimony and the post-accident examination of the filaments in light bulbs taken from the Mustang showed that Ervin turned off the Mustang's headlights and taillights as he raced through Montpelier, that they were off when he passed the truck stop, and that they were off when he crashed into Kyle Athay's vehicle. About two miles past Montpelier, the Mustang almost collided with an oncoming semi-truck that was turning left into a truck stop. The driver of the semi-truck did not see the Mustang because its lights were off. Sheriff Stacey saw the near-collision. A reasonable inference is that Sheriff Stacey knew that upon leaving Montpelier the Mustang's lights were off, creating a greater hazard that other drivers would not see the Mustang or that the driver of the Mustang would not see other persons or vehicles on the highway in time to avoid a collision.

The record indicates that Sheriff Stacey was not familiar with the highway north of Montpelier. A reasonable inference is that he did not know what intersections or roadside businesses there may be where vehicles could be entering or leaving the highway. He apparently had no reason to believe that the risk to the public posed by the Mustang barreling down the two-lane highway at over 95 mph with its lights off would decrease once they had passed the Ranch Hand Truck Stop.

Sheriff Stacey testified that upon Deputy Athay's command, he slowed down to give the Mustang some room hoping its driver would slow down. It is not clear from the record how much he slowed down or whether he slowed down enough to signal a termination or lessening of the pursuit. He was close enough at the instant of the collision to see the Mustang go off the left side of the road after it collided with Kyle Athay's vehicle.

The above is not intended to be an exclusive list of factors that the jury could consider in deciding whether Sheriff Stacey's conduct rose to the level of reckless disregard and, if so, whether it was a proximate cause of the collision. That weighing process is, in the first instance, for the jury. These factors, taken together, are sufficient to create a jury issue as to Sheriff Stacey's liability. The Sheriff was an agent of Rich County. The County has not argued either below or on appeal that it would not be liable if Sheriff Stacey were found liable. Therefore, there is also a genuine issue of material fact regarding Rich County's liability.

■■■ **2. Deputy Athay and Bear Lake County.** Deputy Athay was the Chief Deputy in command of the shift during the night of June 10, 1999. According to the district court's memorandum decision granting summary judgment to the Rich County Defendants, the parties admitted that Sheriff Stacey was an agent or servant of Deputy Athay and Bear Lake County after the pursuit entered Idaho. Since Sheriff Stacey was the agent or servant of Deputy Athay and Bear Lake County, any liability of Sheriff Stacey would be imputed to them. There is therefore a genuine issue of material fact regarding the liability of Deputy Athay and Bear Lake County.

■■■ **3. Deputy Ludwig.** When deciding whether there is sufficient evidence to create a genuine issue of material fact regarding whether Deputy Ludwig's conduct reached the level of reckless disregard and/or was a proximate cause of the collision, we must view Deputy Ludwig's conduct separately from that of Sheriff Stacey and Deputy Athay. Two or more persons can be joint

tortfeasors if they "unite in an act which constitutes a wrong to another (joint tortfeasors), intending at the time to commit it, or doing it under circumstances which fairly charge them with intending the consequences which follow." *Griffin v. Clark*, 55 Idaho 364, 377, 42 P.2d 297, 302–03 (1935). There is no evidence in this case, however, that Sheriff Stacey and Deputies Athay and Ludwig united together intending to commit a wrong against anyone. They were attempting to catch a felon who was eluding capture. Two or more people can also be joint tortfeasors even though they were acting independently of each other if the wrongful conduct of each of them was a proximate cause of an indivisible injury. *Woodman v. Knight*, 85 Idaho 453, 380 P.2d 222 (1963). Before they can be found to be joint tortfeasors in that circumstance, however, they must each engage in wrongful conduct that was a proximate cause of the injury. Thus, we must evaluate Deputy Ludwig's conduct to see if there is sufficient evidence to create a jury issue as to whether his conduct was wrongful (constituted reckless disregard) and was a proximate cause of the collision.

Upon orders from Deputy Athay, Deputy Ludwig attempted to stop the fleeing car by using spike strips. He stopped at milepost 442 of Highway 30 to set up the spike strips, but succeeded only in deflating the Mustang's right front tire. He had not been given a description of the car he was to attempt to stop, but when he saw the speeding Mustang ahead of Sheriff Stacey's vehicle, he correctly assumed it was the Mustang. When the Mustang passed, he could tell it had 3C license plates, but did not see the license number. Deputy Ludwig then retrieved the spike strips and, after Sheriff Stacey went past, joined in the pursuit behind Deputy Athay and Sheriff Stacey. He estimates that he caught up with them just before milepost 439 and that the collision occurred at milepost 431. Thus, he was involved in the chase for about eight miles.

The record does not reflect that Ervin knew there was a third patrol car behind him. There were a couple turns where the video shows the flashing lights of Sheriff Stacey's pickup. Whether Ervin at those points looked back and could see the overhead lights of Deputy Ludwig's Jeep would simply be a matter of speculation. There is no evidence that he did so. When passing through Montpelier, the highway became a five-lane road with two northbound lanes, two southbound lanes, and a center turn lane. Deputy Ludwig stayed in the right-hand lane and Deputy Athay moved into the left-hand lane of the two northbound lanes. There is no evidence that Ervin ever looked back and saw the overhead lights of a third patrol vehicle as they passed through Montpelier.

None of the pursuing officers knew of the car-deer accident north of Montpelier at milepost 431. Although it had been reported to the dispatcher at the Bear County Sheriff's Office, the dispatcher did not relay that information to those involved in the pursuit.

There is absolutely nothing in the record showing that Deputy Ludwig operated his vehicle with reckless disregard for the safety of others or that his conduct induced Ervin to continue fleeing at a high rate of speed. Whether or not Ervin ever saw Deputy Ludwig's patrol vehicle in pursuit would simply be a matter of speculation. His conduct did not change after Ludwig joined the chase. The district court did not err in granting summary judgment dismissing the case as to Deputy Ludwig.

**4. Sheriff Bunn.** The district court granted summary judgment dismissing the case against Sheriff Bunn because he was not on duty during the night of June 10, 1999, and was not involved in the chase. The Athays do not argue that it was error to dismiss Sheriff Bunn. Therefore, the district court did not err in dismissing the case as to Sheriff Bunn.

**E. Does the Limit of Liability Established by Idaho Code § 6–926 Apply to Sheriff Stacey and Rich County?**

Idaho Code § 6–926 limits the liability of a governmental entity and its employees to $500,000, unless the governmental entity has valid, collectible liability insurance in excess of that amount. If it has, then the limit of liability is the limit provided in such insurance. The district court held that Idaho

Code § 6–926 applied to Sheriff Stacey. An "employee" includes a "servant of a governmental entity ... and persons acting on behalf of the governmental entity in any official capacity, temporarily or permanently in the service of the governmental entity, whether with or without compensation." I.C. § 6–902(4). The parties agreed that Sheriff Stacey was a servant of Bear Lake County during that portion of the pursuit occurring in Idaho. The Athays have not argued that Sheriff Stacey did not come within the definition of "employee" in Idaho Code § 6–902(4). Therefore, the district court did not err in ruling that the limits of liability contained in Idaho Code § 6–926 applied to him.

**F. Did the District Court Err in Failing to Grant Sanctions Against the Bear Lake Defendants?**

■ The Athays contend that the district court erred in failing to grant them sanctions for an alleged discovery violation on the part of the Bear Lake Defendants. In support of this assignment of error, they point to the district court's order which simply states, "Plaintiffs' Motion for Sanctions, not warranted. Denied." The Athays do not point to anything in the record supporting their contention that the district court erred, including even their motion for sanctions. They do not point to any court rule that would authorize the awarding of sanctions. They have not shown that the district court erred in denying their request for sanctions.

**G. Are the Athays Entitled to an Award of Attorney Fees on Appeal?**

■ The Athays requested attorney fees on appeal. They stated in their brief, "Plaintiff is entitled to attorney's fees on appeal, IAR 41." They did not cite any statutory or contractual provision authorizing such award. Idaho Appellate Rule 41 specifies the procedure for requesting an award of attorney fees on appeal, but it does not provide the authority for awarding attorney fees. *Camp v. East Fork Ditch Co., Ltd.,* 137 Idaho 850, 55 P.3d 304 (2002). We have repeatedly held that simply requesting an award of attorney fees pursuant to Idaho Appellate Rule 41, without citing any statuto-ry or contractual basis for the award, is insufficient to raise the issue of attorney fees on appeal. *Bream v. Benscoter,* 139 Idaho 364, 79 P.3d 723 (2003). We will therefore not address the issue.

**IV. CONCLUSION**

We affirm the judgments dismissing this case as to Sheriff Bunn and Deputy Ludwig. We vacate the judgments dismissing this case as to the remaining Defendants and remand it for further proceedings that are consistent with this opinion. We award the appellants costs on appeal against respondents Sheriff Stacey, Rich County, Deputy Athay, and Bear Lake County.

Chief Justice SCHROEDER and Justices TROUT, BURDICK and JONES concur.

