# IN THE SUPREME COURT OF THE STATE OF IDAHO

### Docket No. 31706

| | |
|---|---|
| J.R. SIMPLOT COMPANY, a Nevada Corporation, | ) ) Idaho Falls, October 2006 Term |
| Plaintiff-Respondent, | ) ) 2006 Opinion No. 105 |
| v. | ) ) Filed: November 28, 2006 |
| CLAIR D. BOSEN and VIOLA BOSEN, husband and wife, | ) ) Stephen W. Kenyon, Clerk |
| Defendants-Appellants. | ) ) |
| | ) |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, in and for Franklin County.  The Hon. Don L. Harding, District Judge.

The judgment of the district court is <u>affirmed</u>.

Givens Pursley LLP, Boise, and Jay R. McKenzie, Preston, for appellants.  David R. Lombardi argued.

Baker & Harris, Blackfoot, and P. Mark Thompson, Boise, for respondent.  Jared M. Harris argued.

---

EISMANN, Justice.

This is an appeal from a judgment holding that an individual had personal liability on a contract to obtain goods and services for a limited liability company.  We affirm the judgment of the district court.

## I.  FACTS AND PROCEDURAL HISTORY

In early 2000, Clair Bosen and Ron Achs, together with their spouses, purchased 5,100 acres of farm property in Cassia County, Idaho.  Shortly after that purchase, Achs formed Hogs 'N Kisses, LLC, a limited liability company, to operate a hog farm enterprise on the property.

On March 15, 2000, Clair D. Bosen completed and executed a form entitled "Commercial Sales Agreement" with Soilbuilder Financial Services, Inc., in order to obtain services and

products for chemical and fertilizer applications to the farm property. In completing the Sales Agreement, Bosen wrote that the "Customer Account Name" was "Hogs 'N Kisses, LLC," and he checked the box designated "LLC" to indicate the "Type of Ownership." When listing the "Principals Names & Titles" he wrote "Ron Achs" and "Clair Bosen." The form had a box entitled "Acres Owned" and a box entitled "Acres Leased." Bosen did not write anything in the box entitled "Acres Leased," but he wrote "5100" in the box entitled "Acres Owned." The LLC did not own any real property, so the 5,100 acres could only refer to the real property that Bosen and his wife had purchased with Achs and his wife.

At the bottom of the Sales Agreement form was a paragraph entitled "Agricultural Business Agreement." The first paragraph of that section stated as follows:

> Applicant agrees to pay the total amount due on each invoice/customer statement in accordance with the payment terms thereon, unless otherwise agreed in writing. Failure to pay when due (according to approved terms) will result in the addition of a service charge each month at the highest rate allowed by law. Applicant agrees to pay such service charge and all additional costs incurred by Soilbuilders Financial Services, Inc., in collecting payments due, including attorney's fees for litigation or bankruptcy.

The form does not state whether the Applicant is also the Customer. In the box for "Applicant's Signature," Bosen wrote "Clair D. Bosen," without indicating that he was signing in a representative capacity.

In order to obtain an extension of credit, Bosen executed a Security Agreement and a Financing Statement. The Security Agreement granted Simplot a security interest in all crops grown on the real property. "Hogs N Kisses, LLC" and "Clair D. Bosen" were each listed as a debtor on both the Security Agreement and on the Financing Statement, and Bosen signed both documents "Clair D. Bosen," without indicating he was signing in a representative capacity.

On December 29, 2002, Simplot filed this lawsuit against Clair and Viola Bosen to recover the unpaid balance owing for goods and services provided under the Commercial Sales Agreement. It later filed an amended complaint adding Ron and Amy Achs as defendants. The Bosens and Simplot moved for summary judgment. On October 6, 2004, the district court issued its memorandum opinion and order granting Simplot's motion and denying the Bosens' motion. The Bosens then filed a motion for reconsideration, which the district court denied by its

memorandum decision and order issued on March 2, 2005. The Achs had also moved for summary judgment, which the district court granted.

The district court entered a judgment in favor of the Achs, dismissing the amended complaint as to them and awarding them costs and attorney fees against Simplot in the sum of $5,925.99. It also entered a judgment in favor of Simplot against the Bosens in the sum of $70,945.53 principal, plus $33,091.08 in interest and $11,672.12 as costs and attorney fees, for a total judgment of $115,708.73. The Bosens then appealed.[1]

## II. ANALYSIS

### A. Is There a Genuine Issue of Material Fact?

Summary judgment can only be granted when there are no genuine issues of material fact. *Read v. Harvey*, 141 Idaho 497, 112 P.3d 785 (2005). The first issue is whether there are any genuine issues of material fact that would have precluded the granting of summary judgment. The Bosens contend that there are two issues of disputed fact.

First, they contend that there is a genuine issue of material fact concerning whether Bosen was a member of Hogs 'N Kisses. Achs testified in his deposition that he was the only member of the limited liability company, but that Bosen was authorized to manage the farm operation during 2000. Bosen stated in his first affidavit, "I understood I was a member of Hogs 'N Kisses, LLC in the year 2000." He argues that this disputed fact is material because "he would have no liability to Simplot under the Commercial Sales Agreement as member of the limited liability company." He relies upon Idaho Code § 53-619[2] to support that argument. That statute does not grant immunity to members of limited liability companies. It merely provides that they are not liable for debts of the limited liability company "solely by reason of being a member." The district court did not hold Bosen liable because he was a member of Hogs 'N

---

[1] The Bosens have not challenged on appeal the finding of personal liability against Viola Bosen that was apparently based solely upon the fact she was married to Clair Bosen. See *Twin Falls Bank & Trust Co. v. Holley*, 111 Idaho 349, 352, 723 P.2d 893, 896 (1986) ("To the extent a lending institution enters into a creditor-debtor relationship with either member of the marital community or with both members, it does so on a purely individual basis").

[2] That statute provides:

> A person who is a member of a limited liability company is not liable, solely by reason of being a member, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the limited liability company, whether arising in contract, tort or

Kisses. It found that he had personally incurred a debt for goods and services provided to the limited liability company. Whether or not Bosen was a member of the limited liability company is immaterial to the issue of whether he had personally incurred the debt.

The second alleged issue of material fact is based upon Bosen's statement in his first affidavit that he signed the Commercial Sales Agreement on behalf of Hogs 'N Kisses and that "I did not, at any time, enter into an agreement with Plaintiff, as an individual, for the delivery of any fertilizer or other goods or services to the Cassia County property." In his second affidavit, he also stated, "At no time did I intend or agree to be personally liable or to guarantee the Hogs N' Kisses, LLC account with J. R. Simplot Company." Bosen's statement that he did not enter into an agreement with the Simplot or intend to be liable on the Hogs 'N Kisses account does not create an issue of material fact.

If the provisions of a contract are ambiguous, the interpretation of those provisions is a question of fact which focuses upon the intent of the parties. *Bream v. Benscoter*, 139 Idaho 364, 79 P.3d 723 (2003). The determination of the parties' intent is to be determined by looking at the contract as a whole, the language used in the document, the circumstances under which it was made, the objective and purpose of the particular provision, and any construction placed upon it by the contracting parties as shown by their conduct or dealings. *Ramco v. H-K Contractors, Inc.*, 118 Idaho 108, 794 P.2d 1381 (1990); *International Eng'g Co., Inc. v. Daum Indus., Inc.*, 102 Idaho 363, 630 P.2d 155 (1981). A party's subjective, undisclosed intent is immaterial to the interpretation of a contract. As explained in 17 Am. Jur. 2d, Contracts, § 347 (2004):

> A party's subjective, undisclosed intent is immaterial to the interpretation of a contract, as under the objective law of contract interpretation, the court will give force and effect to the words of the contract without regard to what the parties to the contract thought it meant or what they actually intended for it to mean. The court will not attempt to ascertain the actual mental processes of the parties in entering into the particular contract; rather the law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest.

otherwise or for the acts or omissions of any other member, manager, agent or employee of the limited liability company.

In this case, Bosen does not contend he ever verbalized to any of Simplot's agents his intent not to be personally obligated under the contract. His subjective intent or belief does not create a genuine issue of material fact.

The Bosens also argue that there is an issue regarding the credibility of Brian Davis, a Simplot representative, based upon two statements made by Davis. The first statement was that Bosen signed the Commercial Sales Agreement in the presence of Davis, and the second was that Davis spoke with Bosen about obtaining a lien on the barley crop.

In his affidavit submitted in opposition to the Bosens' motion for summary judgment, Davis stated, "That I met with Clair Bosen personally when the documents were signed and the documents were signed in my presence." Bosen then deposed Davis, and he admitted that he did not recall whether Bosen signed the Commercial Sales Agreement in his presence. The affidavits of Bosen and Kurt Olson, a Hogs 'N Kisses employee, show that a Simplot employee brought the Agreement to the farm's office, that Olson faxed it to Bosen, and that Bosen completed and signed it and faxed it back.

Davis also testified in his deposition that he did not recall talking with anyone other than Bosen concerning Hogs 'N Kisses and that he discussed the crop lien with Bosen. Kurt Olson's responsibilities as an employee of Hogs 'N Kisses included setting up accounts for goods and services. He stated in his affidavit and in his deposition that he talked with Davis about purchasing fertilizer on credit for Hogs 'N Kisses, that Davis required a crop lien to extend credit, and that he told Davis that Simplot could have a lien on the barley crop as security for the transaction. The Bosens argue that the record shows that Davis did not remember his conversation with Olson and that Davis wrongly stated that his conversation about obtaining a lien on the barley crop was with Bosen, when it was in fact with Olson. The Bosens have not pointed to any place in the record where Bosen denied also discussing the crop lien with Davis. They simply argue that because Olson discussed the crop lien with Davis, Bosen must not have done so.

"Summary judgment is not proper where the depositions and affidavits raise any question as to the credibility of witnesses." *Athay v. Stacey*, 142 Idaho 360, 367, 128 P.3d 897, 905 (2005). That rule only applies, however, if the testimony of the witness is material. The district court did not rely upon any of Davis's testimony in granting summary judgment, nor has Bosen

5

contended that any of Davis's testimony, if believed, would preclude summary judgment. Therefore, the issue of Davis's credibility is not material to the summary judgment.

**B. Does the Record Reasonably Support the Trial Court's Findings as to the Reasonable Inferences to be Drawn from the Facts?**

In this case, neither party requested a jury trial. "When an action will be tried before the court without a jury, the trial court as the trier of fact is entitled to arrive at the most probable inferences based upon the undisputed evidence properly before it and grant the summary judgment despite the possibility of conflicting inferences. *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 360-61, 93 P.3d 685, 691-92 (2004). "The test for reviewing the inferences drawn by the trial court is whether the record reasonably supports the inferences." *Id.*

In its memorandum decision, the district court stated that the three documents signed by Bosen were unambiguous and that it did not have to consider extrinsic evidence. In its decision, however, it considered extrinsic evidence. It also recognized that when a case is to be tried to the court without a jury, the court can resolve conflicting inferences to be drawn from the undisputed facts. Therefore, we will review the court's conclusions to determine whether the record reasonably supports the inferences drawn by the court.

Bosen filled out and signed the Commercial Sales Agreement. At the top of the Commercial Sales Agreement is a blank for inserting "Customer Account Name." Bosen wrote "Hogs 'N' Kisses LLC." in that blank. At the bottom of the document is a paragraph entitled "Agricultural Business Agreement" under which the "Applicant agrees to pay the total amount due on each invoice/customer statement in accordance with the payment terms thereon, unless otherwise agreed in writing." The only signature space on the document is for the Applicant. The document does not define the Applicant as being the Customer. Bosen signed as the Applicant without designating that he was signing in a representative capacity. The document could be read as Bosen signing in his individual capacity as Applicant or in a representative capacity as an agent of Hogs 'N Kisses. When deciding whether Bosen signed in his individual capacity or in a representative capacity, the district court considered various other facts.

The court considered the Security Agreement and Financing Statement signed by Bosen, which were executed to provide security for the debt that would be created by extending credit under the Commercial Sales Agreement. When initially discussing the transaction, Olson had

6

told the Simplot representative that Simplot could have a security agreement in the barley crop. Bosen did not sign the Security Agreement and Financing Statement, however, until after he had signed the Commercial Sales Agreement. The debtor identified in the Security Agreement was "Hogs N Kisses, LLC, Clair D. Bosen." The district court interpreted this as indicating that both were debtors. The Financing Statement executed at the same time listed "Hogs N Kisses, LLC" as one debtor and "Bosen, Clair D." as the second debtor. Bosen signed both documents "Clair D. Bosen" without indicating he was signing in a representative capacity. The district court inferred that by doing so, "Clair Bosen had to realize that Simplot considered him a debtor." He would only be a debtor in this transaction if he was personally obligated under the Commercial Sales Agreement.

In his second affidavit, Bosen stated that he had been involved in farming and ranching for forty years and during that time had engaged in business as a sole proprietor, a partner in a partnership, a shareholder in a corporation, and a member of a limited liability company. The district court noted that with that experience Bosen "filled out the agreement with a strong knowledge and background of normal business practices." The court also considered that when filling out the Commercial Sales Agreement, Bosen wrote that the acres owned were 5,100 and that Hogs 'N Kisses did not own any land. The district court concluded that Bosen "signed the Commercial Sales Agreement in his own name and as owner of 5,100 acres."

The court also stated that any ambiguity created by the manner in which Bosen filled out and signed the Commercial Sales Agreement should be construed against him. The district court did not err in doing so. "The rule is clear, that a contract should be construed most strongly against the party preparing it or employing the words concerning which doubt arises." *Big Butte Ranch, Inc. v. Grasmick*, 91 Idaho 6, 9, 415 P.2d 48, 51 (1966). Stated another way, "Where there is doubtful language in a contract, it will be interpreted most strongly against the party who provided that language." *Werry v. Phillips Petroleum Co.*, 97 Idaho 130, 136, 540 P.2d 792, 798 (1975).

Bosen pointed out that Simplot had never asked him to sign a personal guaranty. He argues that had Simplot wanted him to be personally liable, it would have asked for such a guaranty. The district court considered that fact and did not find the inferences to be drawn from it persuasive.

7

In deciding what inferences to draw from the undisputed facts, the district court made various factual findings based upon those inferences. Because the district court was the trier of fact, we must uphold those findings if they are reasonably supported in the record. We cannot conclude that the district court's conclusions are not reasonably supported in the record. We therefore affirm the judgment of the district court.

Part I of the dissent explains the result it would have reached as the trier of fact. In doing so, the dissent relies upon some of the deposition testimony of Simplot's agent Brian Davis to conclude that Simplot was looking solely to the barley crop for repayment. There was other testimony of Davis in which he testified he was not looking solely to the barley crop for repayment. Davis's deposition testimony included the following:

> Q. Did you convey, and I'm not asking for your reconstruction. I'm asking for what you actually know. Did you convey to Mr. Bosen at the time that you collected the commercial sales agreement that you expected him to pay for any amount of the Hogs N Kisses' bill that was not paid by Hogs N Kisses and the crops?
> A. I don't recall specifically saying that.
> Q. Did you say anything like that to him?
> A. Yes. Mr. Bosen was responsible for the bill. There was no misunderstanding about that.
> Q. How did you say that to him?
> A. I don't recall specifically. I know that we would have had to have that conversation for me to go forward with his signature on the security documents.
> Q. If you had that conversation that extended beyond the security documents, then why didn't you have a personal guarantee?
> A. Because I didn't need it.
> Q. Why didn't you need it?
> A. Because I had a lien on the crops.
> Q. My question, sir, was beyond the crops.
> A. I didn't feel—I felt that since that farm was a very large farm and it was going to be planted in barley, there was no need for anything beyond the crops.
> Q. Okay. So you really never even considered the necessity for Mr. Bosen to personally pay the debt to Simplot because you thought the crops were going to be adequate, didn't you?
> MR. HARRIS: Objection. Mischaracterizes his prior testimony.
> MR. LOMBARDI: It's not a valid objection. You can answer. Go ahead.
> THE WITNESS: I'm sorry. I think I got lost in the question again. I did consider Mr. Bosen to be responsible for this bill, yes.
> Q. (BY MR. LOMBARDI) But you never told him that, did you?
> A. Yes, I did.

8

Q. Because if you had told him that, you would have asked him to sign a personal guarantee.

A. Why do you make that assumption? That's not true.

Q. Because the –

A. We do business with—we have done business with all kinds of customers that we darn sure make them understand that they're responsible to pay that bill.

Q. But you don't recall specifically saying that to Mr. Bosen, do you?

A. I don't recall the specific words I used.

Q. Okay. And all you recall—well, you don't recall anything. It's just you think that you would have said that to him; correct?

A. I'm certain that I said that to him.

Q. Okay.

A. I'm certain that Mr. Bosen understood from me that he was responsible for this bill.

Q. How are you certain? What makes you certain?

A. Because of the conversation we had.

Q. And the conversation was what?

A. That Mr. Bosen was going to pay the bill.

Q. You had that conversation with him and he said those words?

A. We had the conversation. I don't know. I don't recall what words Mr. Bosen said to me.

Q. And you don't recall what words you said to him?

A. There was no misunderstanding between Mr. Bosen and me as to who was going to pay this bill.

Part II of the dissent addresses issues and supporting arguments it would have presented on appeal on behalf of the Bosens. The Bosens, however, did not raise those issues on appeal.

## C. Is Either Party Entitled to an Award of Attorney Fees on Appeal?

Simplot seeks an award of attorney fees on appeal pursuant to Idaho Code § 12-120(3). It argues that a commercial transaction is the gravamen of this lawsuit. The Bosens agree. Because this is an action to recover on a commercial transaction and Simplot is the prevailing party on appeal, it is entitled to an award of attorney fees pursuant to Idaho Code § 12-120(3).

The Bosens also seek an award of attorney fees on appeal pursuant to Idaho Code § 12-120(3). Since they are not the prevailing party in this lawsuit, they are not entitled to an award of attorney fees under that statute.

9

## III. CONCLUSION

We affirm the judgment of the district court and award the respondent costs and reasonable attorney fees on appeal.


Chief Justice SCHROEDER, and Justices TROUT and BURDICK **CONCUR**.


Justice JONES **DISSENTING**.


I dissent because of the unfortunate lessons that can be drawn from this decision. One such lesson is that a seller of goods need no longer obtain a personal guarantee or pierce the protective veil of a limited liability entity in order to hold a representative of the entity personally liable for a purchase. The seller needs only to get the representative to sign a confusing, one-size-fits-all contract, doing away with the bother of asking for a personal guarantee or the tedious business of proving the entity's shield of liability should be disregarded. Another lesson is that the seller may poop away a security interest in goods that are worth much more than the indebtedness and still nail the representative with personal liability. We need not teach these unfortunate lessons because the district court's decision is based on faulty factual and legal analysis and is deserving of reversal.

### I.

As the Court points out, where both parties have moved for summary judgment in a case scheduled for court trial the trier of fact is entitled to arrive at the most probable inferences based upon the undisputed evidence properly before it. The test for reviewing the inferences drawn by the trial court is whether the record reasonably supports the inferences. *Shawver v. Huckleberry Estates, LLC*, 140 Idaho 354, 360-61, 93 P.3d 685, 691-92 (2004). If the record does not reasonably support the inferences drawn by the trier of fact, the summary judgment should not be permitted to stand. With regard to matters of law, this Court exercises free review. *Lettunich v. Key Bank Nat. Ass'n*, 141 Idaho 362, 366, 109 P.3d 1104, 1108 (2005).

The district court committed legal error in construing the Commercial Sales Agreement, Security Agreement, and Financing Statement together as if they constituted the agreement between the parties. While contemporaneous instruments executed by the same parties and having relation to the same subject matter must be construed together as parts of one agreement

10

(*Hill v. Schultz*, 71 Idaho 145, 148, 227 P.2d 286, 589 (1951)), that situation is not present here. In this case there were two distinct transactions – entry of the parties into the Commercial Sales Agreement, which occurred on March 15, 2000, and execution of the Security Agreement and Financing Statement, which occurred about 45 days later. The documents certainly were not contemporaneous. And, the subsequently executed documents substantially changed the character of the transaction. The Commercial Sales Agreement contemplated an unsecured transaction where payment would be made in "30 days or 15th of next mo." When it became it apparent that Hogs 'N Kisses was not going to be able to pay upon those terms, Simplot asked for and received a security interest in the crops of both Hogs 'N Kisses and Clair Bosen, thus eliminating the 30-day payment requirement. Rather than being part of the initial agreement, the Security Agreement and Financing Statement were a completely separate transaction and they essentially modified the initial agreement. It was error for the district court to construe the documents together. Indeed, the district court erred in considering the Security Agreement and Financing Statement as extrinsic evidence of the parties' intent in entering into the Commercial Sales Agreement.

The Court somewhat distances itself from the district court's conclusion that the three documents must be construed together, but the Court is incorrect in considering the Security Agreement and Financing Statement in determining the intent of the parties in entering into the Commercial Sales Agreement. "The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was entered." *Shawver,* 140 Idaho at 361, 93 P.3d at 692. Here, the parties encountered a change in circumstances and entered into a subsequent contract 45 days later for the purpose of modifying their initial agreement. As a general matter, the subsequent contract would not shed a great deal of light on the intent of the parties at the time of the initial contract. Rather, one would find better guidance as to the parties' intent by examining the pertinent facts as of the initial contracting date.

Since the district court erroneously construed the documents together and drew inferences as to the intent of the parties in entering into the Commercial Sales Agreement, based upon language in the Security Agreement and Financing Statement, we do not particularly know what inferences the district court would have drawn had it focused strictly on the Commercial Sales Agreement. For instance, the district court determined that since Mr. Bosen is shown as debtor on the Financing Statement, he intended to be a party to the Commercial Sales

11

Agreement. One can pledge his property as security for an obligation without becoming bound on the obligation itself. Had the district court properly focused on the Commercial Sales Agreement to determine whether or not Mr. Bosen was bound as a party, a different outcome would have been warranted.

The form and content of the Commercial Sales Agreement leaves much to be desired.[3] The bulk of the form deals with the "customer" and seeks information about the customer's address, telephone number, type of ownership, names and addresses of principals, farming information, and lending status, both business and personal. The final part of the form employs the word "applicant" and makes it clear that the applicant will be responsible for payment of any bills incurred by the customer. The form has a signature line for the applicant, as well as a signature line for a spouse or "other owner". There is no request for the person signing to specify any representative status, e.g., as a member of a limited liability company, officer of a corporation, partner of a partnership, trustee of a trust, or otherwise.

The district court believed that because Mr. Bosen signed the form without indicating he was signing in a representative capacity, he had thereby obligated both himself and Hogs 'N Kisses (since it was named as the customer) as parties to the contract. Although the district court indicated that it had reached this conclusion without referring to extrinsic evidence, a review of the court's rulings on the summary judgment and reconsideration motion indicates otherwise. Since Hogs 'N Kisses was not a party to this action, the district court's conclusion regarding the limited liability company's liability under the contract might be considered superfluous. However, it does raise a good point. The Court concludes that Mr. Bosen obligated himself as a party to the contract because he did not provide the information, which was not sought by the form, as to whether he was signing in a representative capacity. Assuming the Court is correct, was Hogs 'N Kisses obligated under the contract?

The Court believes that the Mr. Bosen obligated himself, personally, by not stating that he was signing in a representative capacity. If he was not signing in a representative capacity, it would seem that the customer, Hogs 'N Kisses, could not be obligated under the contract. That would indeed be an absurd result. The form asks for no information about the applicant. However, it wants to know a substantial amount about the customer, including business and

personal banking information, the last fertilizer/chemical supplier, farming information, and other information that would be pertinent in determining the creditworthiness of the customer. The result reached by the court – that despite all of the foregoing, Mr. Bosen was obligated personally because he did not indicate he was signing in a representative capacity, something the form did not ask for – would produce the anomalous result that the signer of the contract was obligated, while the customer was not, except in the instance where a sole proprietor was involved. It appears to be rather obvious, viewing the document within its four corners, that customer and applicant are synonymous. Otherwise, if the applicant and customer are different persons, there is no language in the form that imposes liability upon the customer. If Simplot wanted to know the capacity in which someone representing an entity was signing the contract, it should have requested that information. It is my experience that people do not answer questions that forms do not pose nor provide information that forms do not request. If Simplot was uninterested in knowing the signing party's capacity, it should not be able to impose personal liability on a non-customer signer. The form does ask for the names and titles of principals, presumably of entity customers, and this information should be considered in determining the capacity or authority of the person signing on behalf of the entity customer/applicant. Ideally, as is the case with many lending institutions, a separate form would be made available to an individual or sole proprietor and another, different form would be made available to a contracting entity. By using a one-size-fits-all form, Simplot created confusion from which it now seeks to benefit.

When Mr. Bosen received the Simplot form, he indicated on it that Hogs 'N Kisses was the customer, and that it was a limited liability company. Brian Davis, the Simplot employee who dealt with Mr. Bosen in this matter, acknowledged that he knew he was dealing with a limited liability company "that had been formed to protect the members." In recognition of this fact, when Mr. Bosen received the form, language had been added by Simplot that asked for the tax identification number, presumably of the limited liability company.

I find nothing within the four corners of the document, either as Simplot presented it to Mr. Bosen, or as Mr. Bosen completed it, that would justify a holding that Mr. Bosen, rather than Hogs 'N Kisses, was obligated as customer and applicant.

---

[3] A copy of the first page of the Commercial Sales Agreement as submitted to Mr. Bosen by

13

If it is necessary to examine extrinsic evidence in order to determine Mr. Bosen's liability, I believe the same result would obtain. In making the examination one must be mindful that "a contract should be construed most strongly against the party preparing it or employing the words concerning which doubt arises." *Big Butte Ranch, Inc. v. Grasmick*, 91 Idaho 6, 9, 415 P.2d 48, 51 (1966). It was Simplot, not Mr. Bosen, who prepared the contract form. Simplot made the unfortunate change in terminology from "customer" to "applicant", requested the entity tax identification number, and did not ask that any person signing the form insert a representative capacity.

Other evidence leads to the conclusion that Simplot was looking to Hogs 'N Kisses as the party obligated under the Commercial Sales Agreement. Prior to the signing of the contract, Brian Davis acknowledged to an employee of Hogs 'N Kisses that "he realized that this was a large organization that [another Simplot employee] had told him that it was a large organization with a butt load of money, not to worry about it." Mr. Davis was speaking of an organization, the limited liability company, rather than Mr. Bosen, an individual. Mr. Davis went on to tell the Hogs 'N Kisses employee that Simplot would need a lien on something, but nothing was arranged in that regard prior to execution of the Commercial Sales Agreement. Indeed, the Commercial Sales Agreement was unsecured. It called for payment within 30 days, which would render a security interest in growing crops superfluous (unless they were of the extremely fast-growing type).

Under the Commercial Sales Agreement, the "applicant" agreed to pay the total amount due on "each invoice/customer statement." Simplot sent its billings for fertilizer purchases to Hogs 'N Kisses "in care of" Clair Bosen at the farm property address, 2279 East Yale Road, Declo, Idaho. Invoices were not sent to Mr. Bosen at his home address in Preston.

If inferences can reasonably be drawn from the execution of the security documents, the inferences would indicate that Mr. Bosen was not personally liable as a party on the Commercial Sales Agreement. When it turned out that Hogs 'N Kisses did not have enough of a butt load of money to pay invoices on a 30-day basis, Simplot sought security. Although Mr. Davis did not recall talking to Mr. Bosen about the Commercial Sales Agreement, he did recall discussing the

Simplot is appended hereto as Figure 1.

14

later-executed security documents. Mr. Bosen points out that, when asked how the account was established for Hogs 'N Kisses, Mr. Davis replied:

We obtained a Commercial Sales Agreement signed by Mr. Bosen. And, I don't recall the specifics, but at some point I understood that they were not going to be able to pay the account net 30 days, according to our normal terms. So I agreed with Mr. Bosen that we would extend terms to harvest in return for security in the crops grown on the farm.

In response to the question, "So, in deciding to extend credit to Hogs 'N Kisses, LLC, the only thing that you relied on in making that decision was that you would have a first position lien on the crops; is that correct?", Mr. Davis replied, "On the crops owned by Mr. Bosen and Hogs 'N Kisses, that's correct."

Mr. Davis was asked, "Was there a way, if you intended to extend credit to a limited liability company but you wanted to have the individual members liable for the credit extended, was there a way you could do that?" He replied, "We could have taken a personal guarantee." Mr. Davis then said it was not necessary to obtain a personal guarantee from Mr. Bosen, "Because I had a lien on Mr. Bosen's crops and Hogs 'N Kisses' crops." In response to the question, "So, you didn't talk with Mr. Bosen about him giving a personal guarantee because you felt that your credit was adequately protected by your lien on the crops in Cassia County; correct?", Mr. Davis stated, "That's correct."

Thus, it becomes clear that when the Security Agreement was being discussed between the parties, Simplot was looking solely to the crops as the source of payment. Simplot obtained a security interest in all crops being grown, both by Hogs 'N Kisses and Mr. Bosen, on the 5,100 acre Cassia County farm. Of further interest, is the fact that neither in Simplot's initial complaint nor in its amended complaint is there any mention of the Commercial Sales Agreement. However, the amended complaint recites that "defendant" granted a security interest in all crops growing or to be grown on their property and signed a UCC-1F "to secure the security for the security interest granted." The amended complaint seeks an accounting as to the location and disposition of the crops and proceeds, as well as judgment for the remaining balance owing for the fertilizer. The amended complaint focuses on the Security Agreement and Financing

15

Statement, seeking recovery for breach of contract and accounting, including an accounting with respect to all crops and proceeds of Hogs 'N Kisses.

As pointed out in the Court's opinion, Mr. Davis apparently formed an opinion at some point that Mr. Bosen should be held personally liable on the Commercial Sales Agreement. It appears from Mr. Davis' testimony that this occurred at some time after the parties had entered into the contract. When asked in his deposition whether he recalled talking with Mr. Bosen about the Commercial Sales Agreement, Mr. Davis replied, "I don't." He did not recall how he had obtained the Commercial Sales Agreement. While testifying that he thought Mr. Bosen understood he was obligated on the contract, he couldn't quite bring himself to say that he had expressed to Mr. Bosen that he was looking to him for personal responsibility under the contract. When asked, "Did you ever tell Mr. Bosen that you thought that he would be personally liable for the fertilizer bill from Simplot to Hogs 'N Kisses, LLC?," he responded, "I don't recall specifically having that conversation." As the Court notes, "a party's subjective, undisclosed intent is immaterial to the interpretation of a contract." Mr. Davis may have decided at some point, possibly after the suit was filed and the security disposed of, that Mr. Bosen should be held personally liable on the Commercial Sales Agreement but it does not appear that he ever specifically stated such intention to Mr. Bosen or that he obtained Mr. Bosen's agreement to such liability.

In sum, the only reasonable inferences that may be drawn from the record are that the Commercial Sales Agreement obligated Hogs 'N Kisses as a contracting party, not Mr. Bosen, personally; that Simplot was initially looking to Hogs 'N Kisses' butt load of money as the source of payment for the fertilizer; that when Hogs 'N Kisses was not able to pay the fertilizer bill as initially agreed, Simplot sought security from both Mr. Bosen and Hogs 'N Kisses and received a security interest in all of their crops being grown on the property; that Simplot was looking solely to the crops as the source of payment of the fertilizer bills; that even if the Commercial Sales Agreement could be construed to make Mr. Bosen personally liable, the security documents modified it to make the crops the sole source of payment; and that the contrary inferences drawn by the district court are unsupported by the record and unreasonable.

## II.

As noted, this action was initiated to enforce the creditor's rights in a secured transaction. While Mr. Bosen did not contest the fact that he had obligated his barley crop as security for the

Simplot fertilizer bills, he argued both below and before this Court that the extent of his liability was the crop security granted to Simplot, particularly the barley crop that he grew on the Cassia County property. At oral argument, it was disclosed that Simplot did receive the benefit of the Bosens' barley crop. The record discloses that this fell short of satisfying the fertilizer bill by $70,945.53. The record further discloses that well over $400,000 worth of hay was grown on the property, that Simplot had a security interest in the hay, and that Simplot purchased the hay. The record does not disclose whether or not Simplot paid less than the market value of the hay in order to exercise a set-off for the amount owing by Hogs 'N Kisses or whether Simplot simply disregarded the rights it had in the hay under the Security Agreement. Mr. Bosen did not do a particularly comprehensive job of developing this argument.

In his motion for reconsideration, seeking to set aside the summary judgment in favor of Simplot, Mr. Bosen contended that Simplot should have set off the balance of the fertilizer account against the amount it paid for the hay. The district court denied the motion for reconsideration stating:

> Bosen indicates that Simplot should have retained income from the hay to pay off
> their debt for the fertilizer. That argument is not persuasive since Simplot did not
> have a security interest in hay regarding money owed for chemical fertilizer, but
> only a security interest in barley.

The district court was mistaken because the Security Agreement granted Simplot a security interest in "[a]ll crops grown, or now growing, or to be grown", on the 5,100 acre farm. Both the complaint and the amended complaint allege that Simplot was granted a security interest in all crops growing or to be grown on the property. Simplot didn't necessarily need an accounting with regard to the hay crop because it bought, and gained possession of, the hay. The record contains a letter in which Simplot acknowledges that it was buying the Hogs 'N Kisses hay, that it would begin hauling the hay in November 2000, and that hay would be paid for upon delivery to its feedlot. That being the case, it appears that Simplot had possession of the collateral before it paid for the hay. In an affidavit submitted in support of his motion for summary judgment Mr. Bosen pointed out that Simplot had "paid at least $418,211.60 to Hogs 'N Kisses" after November 2000. Copies of the checks were attached, showing such payments which included over $100,000 paid for the hay in May 2001. During oral argument, Simplot's counsel stated

that "Simplot always looks to their collateral first" in collecting an account. There is no indication in the record as to whether Simplot did so in this case – by paying less than the market value for the hay – although one might presume that this is not the case because Simplot is suing for a deficiency. If no setoff was exercised, one might justifiably ask why.

Under Article 9 of the Uniform Commercial Code, Mr. Bosen should not face a deficiency judgment because Simplot frittered away its security interest in the hay.[4] Simplot had validly attached a security interest in all crops. I.C. § 28-9-203(1) (2000). The Financing Statement, which Simplot prepared and which omitted any mention of crops other than barley, is irrelevant because the Security Agreement controls the rights between the debtor and the secured party. I.C. § 28-9-201 (2000); *Simplot v. William C. Owens, M.D., P.A.*, 119 Idaho 243, 244-245, 805 P.2d 449, 450-451 (1990). In any event, a security interest is perfected by the secured party's taking possession of the collateral (former I.C. § 28-9-305), which Simplot did after November 2000 and before it paid for the hay. Simplot had knowledge of its rights in the hay and should have exercised them appropriately.

Because Simplot had a security interest in the hay, any sale of that hay should have gone to pay off Hogs 'N Kisses' debt. The company purchased the hay from Hogs 'N Kisses at what should be described as a private sale. The secured party may buy the crop at a private sale "if the collateral is of a type customarily sold in a recognized market." I.C. § 28-9-504(3) (2000). The proceeds apparently did not go to the fertilizer debt. Article 9 dictates otherwise. I.C. § 28-9-504(1)(b) (2000) (proceeds of disposition go first to reasonable expenses, then to "satisfaction of indebtedness secured by the security interest under which the disposition is made"); *accord Stockdale v. Stockdale*, 102 Idaho 870, 874, 643 P.2d 82, 86 (App. 1982). Simplot should have recognized its security interest in the hay and exercised a set-off from its purchase price. Because it failed to avail itself of that opportunity, the company should not be allowed to pursue this suit against Bosen in his individual capacity.

Aside from the application of the Uniform Commercial Code, one might wonder why Simplot did not mitigate its damages by taking advantage of the fact that it was the purchaser and

---

[4] Because the parties signed the Security Agreement in March 2000, the analysis will necessarily focus on "old" Article 9 of the Uniform Commercial Code. *See* I.C. § 73-101 (2006) ("no part of these compiled laws is retroactive, unless expressly so declared"). The Legislature largely replaced Article 9 in 2001. 2001 Idaho Sess. L. ch. 208.

possessor of the hay. It had the ability to make itself whole but failed to do so. Under such circumstances, it is hard to see why this Court should grant another bite at the apple.

## III.

I would reverse the district court's decision and remand with instructions to grant the Bosens' motion for summary judgment.

## COMMERCIAL SALES AGREEME...

UNIT _____

| Customer Account Name | | | Sales / Use Tax # | Date |
|---|---|---|---|---|

| Billing Address / Street | | City | State | Zip Code | Phone ( ) |
|---|---|---|---|---|---|

Type Of Ownership

☐ PROPRIETORSHIP  ☐ PARTNERSHIP  ☐ CORPORATION  ☐ LLC  ☐ LLP  ☐ JOINT VENTURE  ☐ TRUST/ESTATE

| PRINCIPALS NAMES & TITLES | SOCIAL SECURITY #'S | RESIDENCE ADDRESSES |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

### PRESENT FARMING INFORMATION

| CROPS | ACRES | CONTRACT WITH | CROPS | ACRES | CONTRACT WITH |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Acres Owned | Tenancy Is Held As  ☐ Joint  ☐ Community  ☐ Common | Acres Leased | Landlord's Name | Rent / Year ($ or % Amount) $ |
|---|---|---|---|---|

### FINANCIAL INFORMATION

FARMING OPERATIONS: Do You Have a Current Operating Loan?  ☐ YES  ☐ NO

| IF YES, LENDER'S NAME | Branch Address | Phone ( ) |
|---|---|---|
| Loan Officer | Credit Line Total $ | Fertilizer and Chemical Budget $ |

PERSONAL BANKING / OTHER INCOME

| Bank Name | Branch / Address | Phone ( ) |
|---|---|---|
| Savings Account No. | Checking Account No. | Other Sources of Income: |
| Mortgage Holder | Address | $ Market Value | $ Amount Owed |

**Last Fertilizer / Chemical Supplier**

### SALES / USE TAX EXEMPTION CERTIFICATE

Property to be purchased is fertilizers, foliar nutrients, agricultural minerals and/or seeds for use in agriculture, the ultimate end result of which will be food for human consumption.

I hereby certify that these purchases are exempt because of the following reason:
☐ The property is considered animal life, seeds, plants or fertilizer.
☐ The property will immediately be transported for use outside the state of California.
☐ Other (specify) _____

### AGRICULTURAL BUSINESS AGREEMENT

Applicant agrees to pay the total amount due on each invoice/customer statement in accordance with the payment terms thereon, unless otherwise agreed in writing. Failure to pay when due (according to approved terms) will result in the addition of a service charge each month at the highest rate allowed by law. Applicant agrees to pay such service charge and all additional costs incurred by Soilbuilders Financial Services, Inc. in collecting payments due, including attorney's fees for litigation or bankruptcy.

APPLICANT AUTHORIZES SOILBUILDER FINANCIAL SERVICES, INC. TO OBTAIN A CREDIT BUREAU REPORT FROM TRW, CBI, TRANS-UNION AND/OR EQUIFAX AND ALL PERSONS, BANK, AND OTHER AGENCIES LISTED ON THIS APPLICATION ARE HEREBY AUTHORIZED TO PERIODICALLY RELEASE TO SOILBUILDER FINANCIAL SERVICES, INC. ALL FINANCIAL INFORMATION THEY MAY HAVE ABOUT APPLICANT.

*Or 15 Th of Next mo.*

| Total Credit Requested $ | Terms of Sale  30 days | Applicant's Signature  X | Date |
|---|---|---|---|
| Recommended by Fieldperson | No. | Date | Spouse Signature (Other Owner) | Date |

SSB-GEN8 (5/96)

Figure 1. Copy of Simplot form submitted to Clair Bosen for completion and signature.