J. JONES, J.,
concurring in part and dissenting in part.
I concur with Part V.B of the Court’s opinion regarding the “foreign object” issue but dissent with regard to Part Y.A regarding the “some damage” issue. There are simply too many unanswered questions to make the determination that some damage was objectively ascertainable on July 15, 2004, when Dr. Jorgenson operated on Mr. Stuard (the “first operation”).
Interestingly enough, both parties claim that Mr. Stuard sustained injury as a result of the first operation. Mr. Stuard asserts injury to support his claim for medical malpractice. Dr. Jorgenson asserts injury to support his statute of limitations defense. The parties dispute, however, whether the injury was objectively ascertainable as of the date of the first operation. Perhaps we should take the parties’ claims of injury at face value and ignore contrary inferences that starkly appear from the record. Unfortunately, neither party has submitted competent sworn testimony to support their respective positions. Therefore, the Court is left with a rather skimpy record upon which to make its decision.
Based on the slender record before the Court, there does appear to be a genuine issue of material fact as to whether Mr. Stuard suffered an injury at the time of the first operation. Mr. Stuard did not go to Dr. Jorgenson simply to have an operation at the T6-7 level of his spine. Rather, he went to Dr. Jorgenson because he was experiencing pain. The operation performed by Dr. Jorgenson, even though it may have been performed at the wrong level, appears to have alleviated that pain. Therefore, without competent evidence to so indicate, it cannot be conclusively assumed for the purposes of summary judgment that Mr. Stuard suffered an injury at the time of the operation. Nothing in Dr. Jorgenson’s deposition testimony explains what damage resulted from the operation. He does not assert that another operation was necessitated by virtue of what he did or did not do in the first operation. At the deposition he testified “As a consequence [of the operation], [Mr. Stuard] still had the same pathology and same herniation at the T6-7 level as he had before. And that’s what I believe is causing his current symptoms.” We do not know what Dr. Jorgenson means by “current symptoms” since his deposition was taken on September 19, 2008, and Mr. Stuard was operated upon at T6-7 by Dr. Tyler Frizzell on March 21, 2007. We do know that Mr. Stuard was in the same condition with respect to T6-7 after the first operation as he was before that operation. There is no competent evidence in the record to establish that Mr. Stuard suffered an injury by leaving T6-7 in the same condition it was in prior to the first operation.
Neither party has addressed the issue of how Dr. Jorgenson could have performed the first operation without concluding that something was amiss. In other words, if the MRI taken prior to the operation disclosed a disk protrusion at T6-7, wouldn’t Dr. Jorgenson have been somewhat surprised to find no disk damage when he was actually performing the operation? Could he have had no suspicion at that time that he may have blundered? Of interest is the fact that Dr. Jorgenson’s operative report, detailing what occurred during the operation, indicates that after the disk was removed, “a moderate sized fragment of disk was encountered and removed---- There was additional calcified disk in this area. This was slowly removed ... until it appeared to be flat.”[9] The fact that Dr. Jorgenson actually removed a piece of fragmented disk and some calcified disk from the T5-6 level, even though it was not *710 the intended level, could very well be the reason that Mr. Stuard’s pain was alleviated by the operation. It would be reasonable to infer on summary judgment that Dr. Jorgenson actually performed a service to Mr. Stuard by repairing the disk at T5-6, even though by accident. It is difficult to infer that Mr. Stuard suffered injury from the operation simply because the operation was done on the wrong area when it did, in fact, relieve his symptoms. Nothing in the record indicates that Mr. Stuard would have needed additional medical treatment for his initial pain symptoms had he not sustained a second injury that resulted in the discovery that the first operation was apparently performed in the wrong place.
Furthermore, the only evidence in the record regarding the injury Mr. Stuard allegedly suffered on the date of the first operation is the self-interested and conclusory testimony of Dr. Jorgenson himself. In his affidavit, Dr. Jorgenson states that the operation resulted in objectively ascertainable injury without explaining exactly what that injury might be. The sum total of affidavit testimony on the issue reads, “The operation ... caused objectively ascertainable injuries and some damages ...” The affidavit preparer was obviously familiar with the language of the medical malpractice cases, if not the rule requiring facts, instead of conclusory statements, in a summary judgment affidavit. I.R.C.P. 56(e); Dulaney v. St. Alphonsus Reg’l Med. Ctr., 137 Idaho 160, 164, 45 P.3d 816, 820 (2002) (In a medical malpractice ease, statements that are conclusory do not satisfy either the requirement of admissibility or competency under Rule 56(e)). Dr. Jorgenson goes on to state that his operative report sets forth the injuries and damages caused by operating at the wrong spinal level. However, nothing in the operative report explains what injury occurred by virtue of the operation. In fact, as mentioned above, the operative report indicates that Dr. Jorgenson took steps during the operation that could have resulted in Mr. Stuard’s pain being alleviated.
Dr. Jorgenson’s argument that there may have been some healthy bone and flesh removed during the operation does not establish that there was an injury. As a matter of fact, there is no competent evidence in the record to support this contention. Dr. Jorgenson gave no testimony in this regard. He merely states that the “injuries and damages” are set forth in his operative report, leaving it to the Court to ponder the report and speculate what might or might not have been injurious. Indeed, there is no testimony in the record explaining how what was done or not done in the first operation might have been injurious or the cause of damage to Mr. Stuard. Neither is there any testimony indicating that the second operation by Dr. Frizzell was necessitated as a result of the first operation. The only document in the record indicating what occurred at the second operation is Dr. Frizzell’s operative report which is attached to the affidavit of Mr. Stuard’s attorney. The report was not prepared by the attorney, it makes no mention of the first operation and, without foundation or authentication, the report is mere inadmissible hearsay. For all we know from the record, the second operation was necessitated by Mr. Stuard’s second injury, which occurred on August 31, 2006, and had nothing to do with what did or did not occur in the first operation.
While Mr. Stuard would have to prove an injury resulted from Dr. Jorgenson’s negligence, if this case were to be remanded for trial,[10] there is a genuine issue of material fact regarding whether he suffered an injury at the time of the first operation, making summary judgment inappropriate on statute of limitations grounds at this stage of the proceedings.
Even if Mr. Stuard can be said to have sustained an injury at the time of the first operation, there is no credible evidence in the record suggesting that such injury was objectively ascertainable at that time. Dr. Jorgenson’s testimony that the erroneous locale of the operation could have been objectively *711 ascertained by an MRI taken shortly after the operation is of questionable credibility because of the fact that Dr. Jorgenson himself could not ascertain the error the first two times he reviewed the MRI taken on September 20, 2006. “Summary judgment is not proper where the depositions and affidavits raise any question as to the credibility of witnesses,” and where the testimony of the witness is material. J.R. Simplot Co. v. Bosen, 144 Idaho 611, 615, 167 P.3d 748, 752 (2006) (quoting Athay v. Stacey, 142 Idaho 360, 368, 128 P.3d 897, 905 (2005)). Issues that turn on credibility should be reserved for determination by the trier of fact.
Specifically, Dr. Jorgenson testified during his deposition that he reviewed the September 20 MRI online with Mr. Stuard during his visit on September 28, 2006. When Dr. Jorgenson was asked whether he “note[d], then, on September 28 that [his] surgery had been at the wrong level,” Dr. Jorgenson answered “no.” When Dr. Jorgenson’s counsel was asked during oral argument before this Court why Dr. Jorgenson could not tell from the MRI that the operation had been performed at the wrong level, counsel conceded he could provide no explanation. Dr. Jorgenson met with Mr. Stuard again on October 23, 2006. Dr. Jorgenson’s notes from that visit state, “[r]eview of [Mr. Stuard’s] MRI does document a T6-7 disk protrusion as well as T7-8 foraminal disk protrusion off to the left.” These notes indicate that the September 20 MRI results showed a protrusion at the site Dr. Jorgenson believed he had operated on and fixed.[11] However, when asked whether he realized during the second review of the MRI that his surgical procedure was performed at the wrong level, Dr. Jorgenson answered “no.” When confronted with this inconsistency at his deposition, Dr. Jorgenson stated, “[i]n reviewing that note, I believe that’s a typographical error. I believe what it should say is he had a T6-7 fusion____ Because I didn’t discuss the level of the fusion.” Therefore, although Dr. Jorgenson met with Mr. Stuard three times[12] after the September 20 MRI was taken, and reviewed the MRI at least twice, he testified he was still unable to determine that he had operated on the wrong level of Mr. Stuard’s spine.[13] According to Dr. Jorgenson, it was not until a nurse case manager, who had reviewed the radiologist’s report with regard to the MRI,[14] contacted him regarding the discrepancy in the levels that he was finally aware that he may have operated on the wrong level. Dr. Jorgenson then ordered another MRI, which he testified that he reviewed and was able to finally determine that he operated on the T5-6 level instead of the T6-7 level.
Dr. Jorgenson’s testimony that Mr. Stuard’s injury was objectively ascertainable from reading an MRI is certainly of questionable credibility because Dr. Jorgenson himself failed to ascertain the mistake at *712 least twice from reading the September 20 MRI. The infirmities in Dr. Jorgenson’s testimony lend themselves to the drawing of one of three reasonable inferences: (1) Dr. Jorgenson lacked adequate foundation to testify as to whether the injury was objectively ascertainable and his affidavit and deposition testimony should have been disregarded,[15] (2) he was qualified to make such a determination, but the injury was not truly objectively ascertainable; or (3) the injury was objectively ascertainable, but Dr. Jorgenson concealed the injury until found out by the nurse case manager.[16] Regardless of which of the three is true, summary judgment is not appropriate because the inconsistencies in Dr. Jorgenson’s deposition testimony and affidavit raise a question as to his credibility. Dr. Jorgenson is certainly a material witness because his affidavit and deposition testimony are the only evidence in the record addressing whether the erroneous locale of the operation was objectively ascertainable.[17] Consequently, viewing the evidence in the light most favorable to Mr. Stuard, the evidence is insufficient to support a grant of summary judgment in this case.
In my mind, there is an additional reason to decline affirmance of the summary judgment and that relates to the “some damage” rule that has evolved in medical malpractice eases. The some damage rule in medical malpractice eases is not consistent with the some damage rule in legal malpractice cases and the legal malpractice standard simply makes more sense. Some damage in the legal malpractice sense means ascertainable monetary damage resulting from injurious conduct on the part of the professional. In medical malpractice cases it has been interpreted to mean anything from some injury to the body, without regard to whether the same may be compensable in a damage suit, all the way to actual out-of-pocket monetary damages. Application of the some damage rule in medical malpractice eases is in stark contrast to the application of the some damage requirement in legal malpractice cases. There does not seem to be any logical reason for treating the some damage requirement differently in medical malpractice cases than in legal malpractice cases, which require objective proof supporting the existence of some compensable damage. For example, in Chicoine v. Bignall, an attorney defended Chicoine in a lawsuit that ultimately resulted in a jury verdict for damages against Chicoine. 122 Idaho 482, 482, 835 P.2d 1293, 1293 (1992). The attorney timely filed a motion for a judgment notwithstanding the verdict (J.N.O.V.), and later filed a motion for a new trial. Id. The district court granted the J.N.O.V. motion, but this Court reversed on appeal. Id. On remand, the district court considered and granted the motion for a new trial. Id. On appeal for the second time, this Court reversed the grant of the new trial on the ground that Chicoine’s attorney had failed to timely file the motion. Id. Several months later, Chicoine brought an action for malpractice against his attor *713 ney. Id. Even though it was clear Chicoine’s attorney had been negligent and that Chieoine had incurred attorney fees in defending the action after his attorney’s negligent act of failing to timely file the motion for a new trial, this Court held “there was no objective proof of some damage to Chieoine until this Court reversed the order granting a new trial____” Id. at 487, 835 P.2d at 1298. The Court noted that “[ujntil then, the order granting the new trial, in effect, protected Chieoine from any damage. So long as the trial court’s order stood, Chieoine was entitled to a new trial, despite the untimeliness of the motion.” Id. In other words, until a claimant has a definitive basis for seeking monetary damages, there is no accrual of the legal malpractice claim.
Similarly, in City of McCall v. Buxton, the City of McCall entered into a construction contract with St. Clair. 146 Idaho 656, 657, 201 P.3d 629, 630 (2009). St. Clair encountered various delays during the course of the construction, and the City concluded St. Clair was not in compliance with the terms of the contract. Id. at 658, 201 P.3d at 631. On the alleged advice of its attorneys, the City terminated its contract with St. Clair. Id. Wausau, which had issued a performance bond on behalf of St. Clair, hired a replacement contractor to complete the work pursuant to the contract. Id. The City concluded that the replacement contractor’s work was deficient and, on the alleged advice of its attorneys, the City decided to withhold payment to Wausau for its replacement contractor and hire another contractor. Id. In December of 2001, Wausau sued the City for wrongfully withholding payment. Id. In January of 2002, the City began incurring expenses as a result of defending the Wausau action. Id. St. Clair later filed a cross-claim against the City. Id. After a trial on the merits of St. Clair’s and Wausau’s claims, a jury awarded damages against the City. Id.
The City subsequently brought a malpractice action against its attorneys alleging, in part, that the attorneys negligently advised the City to terminate its contract with St. Clam and withhold payment from Wausau. Id. In reversing the district court’s conclusion that these claims were barred by the statute of limitations, this Court held that “under the circumstances of this case, the existence or effect of any alleged negligence on the part of the City’s Attorneys regarding their legal advice and strategy depended upon the outcome of the litigation against the City by Wausau and St. Clair. There would not be objective proof of actual damage until that occurred.” Id. at 663, 201 P.3d at 636. This was true even though the City was already well aware of conduct giving rise to a claim for professional malpractice and had already been incurring costs associated with defending the actions against it.
These eases demonstrate that in the context of legal malpractice, the Court requires some actual, objective proof of monetary damage before the statute of limitations period is commenced. In Chicoine, the act of filing the late motion for a new trial was itself wrong. However, there was no objective proof that there was any monetary damage until the appellate court reversed the district court’s grant of the new trial. In other words, the adverse court ruling against Chicoine demonstrated that some damage had occurred. In Buxton, even though it clearly appeared that the Buxton firm may have breached its duty to the City and even though the City was accruing costs associated with defending the resultant lawsuit, this Court was not willing to say some damage had occurred until a verdict was entered against the City. Until there was an actual finding that the City was monetarily liable to Wausau and St. Clair, there was only a potential risk that the attorney’s actions would result in any damage to the City. Similarly in this case, there has been no credible testimony from a qualified doctor indicating that Mr. Stuard was damaged and that some remedial measures were necessary to repair that damage. Based on the lack of credible medical testimony we are left to speculate as to whether and when Mr. Stuard may have sustained a compensable injury. Therefore, I would hold that, pursuant to this Court’s holdings in Chicoine and Buxton, there must be some credible medical evidence demonstrating that some damage of a monetary nature — in this case, an injury to Mr. Stuard’s body that required the outlay of monetary resources to repair — occurred be *714 fore I would find that the statute of limitations begins to run in a medical malpractice action.
This principle regarding some damage was applied by this Court in Hawley v. Green, 117 Idaho 498, 788 P.2d 1321 (1990). In that case, Hawley received three chest x-rays between 1979 and 1983, each of which was reviewed by a different doctor. Id. at 499, 788 P.2d at 1322. Even though the x-rays revealed that Hawley had a tumor in her lower neck and chest area, each of the three doctors failed to diagnose it. Id. at 500, 788 P.2d at 1323. Hawley did not learn of the tumor until several years later when a different doctor diagnosed it after reviewing an x-ray of her chest. Id. After the tumor was surgically removed, Hawley learned the tumor was malignant. Id.
Hawley then filed a medical malpractice action against the doctors for negligently failing to diagnose the tumor. Id. The district court found that “since Hawley’s tumor was visible on the X-rays from 1979 through 1983, there was objectively ascertainable damage at that time, and the statute began to run no later than 1983____” Id. On appeal to this Court, Hawley argued that because there was no evidence presented before the district court regarding whether the tumor was in fact malignant when the doctors failed to diagnose it, there was a genuine issue of material fact as to whether damage occurred at that time. Id. at 503, 788 P.2d at 1326. This Court found that the statute of limitations had not expired, noting that,
the record in the present ease does not contain any evidence to show that any damage was occurring at the time the defendants failed to diagnose Hawley’s tumor. The only facts that are established and uneontroverted in this record are that the tumor was evident on the X-rays taken between 1979 and 1983. There is no evidence in the record one way or another concerning whether during 1979-83 the tumor was progressive, malignant, harmful or in any manner dangerous at this point in time. While we might speculate, as the district court apparently did, that the tumor was progressive, malignant, or otherwise dangerous, the record does not establish that as an uncontradicted factual matter.
Id. at 504, 788 P.2d at 1327.
This case is similar to Hawley because, just as there was no evidence establishing that the mere existence of the tumor was harmful to Hawley, there is no evidence here indicating that the mere fact that the surgery was done at the wrong level was harmful to Mr. Stuard. In fact, even though Dr. Jorgenson operated on the wrong level of Mr. Stuard’s spine, Mr; Stuard’s pain was alleviated and his symptoms were cured. Although this Court might speculate that Dr. Jorgenson’s mistake of operating at the wrong level caused him some harm, there is no evidence in the record to establish that determination as an uncontradicted fact. For purposes of summary judgment, we are required to draw all reasonable inferences in favor of Mr. Stuard and, therefore, I cannot say there is no genuine issue of material fact as to whether Mr. Stuard suffered some damage.
I would vacate the district court’s grant of summary judgment in favor of Dr. Jorgenson and remand for determination of the unanswered questions that manifest themselves from the skimpy record before the Court.
Justice BURDICK concurs.

. During oral argument before this Court, Dr. Jorgenson’s counsel was asked why Mr. Stuard’s pain was relieved, even though the operation was performed at the wrong level. Counsel indicated that it was either because Mr. Stuard had not really been suffering pain, implying that he was malingering, or that the pain was alleviated by the placebo effect. He could offer no other reason. Apparently, it did not occur to him that the first operation resulted in the removal of disk material that may have been causing the pain from which Mr. Stuard was seeking relief.

. Presumably, he would have to either show that he suffered injury by virtue of Dr. Jorgenson’s failure to remedy the alleged problem at T6-7 or that he suffered injury at T5-6 as a result of the operation performed at that level. Further, he would need to establish that the injury was objectively ascertainable within the limitations period.

. Dr. Jorgenson originally planned to operate on the T6-7 level to repair Mr. Stuard’s herniated disk, or disk protrusion, but he erroneously operated on the T5-6 level. As such, if the MRI truly did show, as Dr. Jorgenson’s notes indicate, that there was still a protrusion at the T6-7 level, Dr. Jorgenson would have been on notice that there was still some herniation at the T6-7 level and the operation had actually been done at the T5-6 level. Curiously, Dr. Jorgenson claims this was a typographical error.

. Dr. Jorgenson also met with Mr. Stuard on October 9, 2006. Neither the deposition testimony nor Dr. Jorgenson's notes indicate whether the MRI results were reviewed again during this visit, but Dr. Jorgenson testified that as of the October 9 visit, he was still unaware that the surgery had been performed at the wrong level.

. It is also worth noting that, according to Dr. Jorgenson’s testimony, the several x-rays taken after the surgery showed only a portion of Mr. Stuard’s spine and, therefore, "he did not have the ability to count levels and to accurately assess the actual levels where the hardware was placed.” However, Dr. Jorgenson’s notes dated February 25, 2005, state “Plain films taken in our office today show fusion at T6-7 level with an anterior plate." This statement in Dr. Jorgenson’s notes, indicating that the level in which the fusion was located was discernible from the plain films, is in apparent conflict with his testimony that the levels could not be discerned from plain x-rays. This further demonstrates concern about Dr. Jorgenson’s credibility.

.Dr. Jorgenson testified that although he reviews his own MRIs, he also uses a radiologist’s interpretation of the MRI results. The record indicates that both Dr. Jorgenson and the nurse case manager reviewed the radiologist’s report regarding the September 20 MRI, but for some reason that report is not in the record, nor was any testimony from the nurse case manager.

. Idaho Rule of Civil Procedure 56(e) provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify about the matters stated therein.” If two reviews of an MRI were not sufficient for Dr. Jorgenson to identify the error in the operation, even though a nurse reviewing the radiologist's report of the same images was able to discern the mistake, then Dr. Jorgenson was seemingly not competent to testify on the matter.

. This latter inference may be supported, to an extent, by the fact that Dr. Jorgenson failed to indicate in his report of the operation his failure to find a disk protrusion at the level he was operating upon when he was actually inside of Mr. Stuard's back. Curiously, Mr. Stuard has not claimed that Dr. Jorgenson knowingly concealed the alleged mistake, which might have been a more convenient way to avoid the statute of limitations problem.

.Of interest is the fact that Mr. Stuard's attorneys filed a Plaintiffs’ Expert Witness Disclosures on March 25, 2009, approximately a month and a half prior to the hearing on the motion for summary judgment, wherein they disclosed that their medical expert, Dr. Frizzell, who performed the second operation, was expected to testify that Mr. Stuard’s "damages and harm ... did not become objectively ascertainable ... until after he suffered a second on-the-job injury on or about August 31, 2006.” This statement, of course, is not competent evidence and, indeed, was not offered in opposition to the motion for summary judgment. It is not clear why an affidavit from the expert was not obtained and produced in opposition to the summary judgment motion.